**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| GBA ASSOCIATES LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | No. 20-116C |
| v. | ) | Filed: April 16, 2024 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In this breach of contract action, Plaintiff GBA Associates Limited Partnership appeals a Contracting Officer's Final Decision ("COFD") by the General Services Administration ("GSA"), which concluded that GSA had for six years overpaid Plaintiff for real estate tax increases in the amount of approximately $3.4 million. The COFD unilaterally re-established the Real Estate Tax Base ("tax base") year and amount provided in the parties' lease (GSA Lease Number GS-11B-02213 ("Lease")). Plaintiff claims the parties bilaterally amended the Lease in 2013 by establishing a tax base year and amount in Supplemental Lease Agreement 7 ("SLA7"), thereby preventing GSA from unilaterally and retroactively adjusting the amount of real estate taxes reimbursable to Plaintiff. GSA claims that the parties did not intend to bilaterally amend the Lease's process for establishing the tax base; rather, SLA7 was merely a unilateral administrative action implementing the Lease's terms. GSA also claims that Plaintiff cannot prove damages because Plaintiff has received more than it has paid in real estate taxes through a portion of GSA's rent payments that was intended to cover estimated taxes.

After an extended period of discovery, this matter is now before the Court on cross-motions for summary judgment. The parties seek partial summary judgment as to whether SLA7 was a

bilateral amendment of the Lease or a unilateral administrative action.  Additionally, Defendant seeks summary judgment as to whether Plaintiff can establish the damages element of its breach of contract claim.  For the reasons outlined below, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Factual Background

Plaintiff is the owner of a building located in Falls Church, Virginia, that is leased to the Government.  First Am. Compl. Ex. A at 2, ECF No. 50-1.  GSA executed the Lease in 2010 on behalf of the U.S. Department of Defense for the purpose of providing office space for the Defense Health Agency ("DHA") headquarters.  First Am. Compl. Ex. H at 3, ECF No. 50-8.  The Lease called for renovation of the existing building and for the phased acceptance of the space by the Government.  ECF No. 50-1 at 4.  Department of Defense property requirements necessitated major renovations to the existing space at a cost of approximately $177 million.  *See* Pl.'s Mot. for Summ. J. ("PMSJ") Ex. 1 at 6, 57, ECF No. 55-2.  The Government accepted 75 percent of the space on December 5, 2011, and the parties agreed via a lease amendment that the Lease commenced on this date.  First Am. Compl. Ex. C at 2, 3, ECF No. 50-3.  The Government accepted 100 percent of the space on June 19, 2012.  Pl.'s Reply Ex. 2 at 10–11, ECF No. 63-2.  The Lease itself consists of Standard Form 2 "U.S. Government Lease for Real Property" ("SF-2") and GSA's Solicitation for Offers ("SFO") that provides a complete summary of the terms of the lease and is incorporated by reference into the SF-2.  *See* ECF No. 50-1; First Am. Compl. Ex D, ECF No. 50-4.

Section 3.4 of the SFO provides the terms applicable to the rental rate. Specifically, Section 3.4.A.2.c states that the rental rate includes the "total building shell rental," tenant improvements, and operating, building, and parking costs. PMSJ Ex. 4 at 18, ECF No. 55-5. As relevant here, the building shell rental includes, among other categories, taxes for the building. *Id.* Plaintiff provided GSA an estimate of real estate taxes for the shell rent at the inception of the Lease. Pl.'s Compl. Ex. F at 3, ECF No. 1-6 (showing estimated real estate taxes of $2,348,017); Pl.'s Compl. Ex. G at 2, ECF No. 1-7 (Line number 16, "SHELL RENT (Including current real estate taxes.)").

Section 4.2 of the SFO governs adjustments to the rent related to real estate taxes. ECF No. 55-2 at 16–17. Specifically, Section 4.2.A provides for a tax adjustment "to account for increases or decreases in Real Estate Taxes for the Property after the establishment of the Real Estate Tax Base." *Id.* at 16. This section also defines the method for determining the tax base. Section 4.2.B.7 states:

> "Real Estate Tax Base" is the Unadjusted Real Estate Taxes for the first twelve (12) month period following the commencement of the Lease term. If the Real Estate Taxes for that Year are not based upon a Full Assessment of the Property, then the Real Estate Tax Base shall be the Unadjusted Real Estate Taxes for the Property for the first full Tax Year for which the Real Estate Taxes are based upon a Full Assessment coincident with a full occupancy. Such first full Tax Year may be hereinafter referred to as the "Tax Base Year."

*Id.* (capitalization and quotes in original). The meaning of "Fully Assessed," is defined in Section 4.2.B.8.

> The Property is deemed to be "Fully Assessed" (and Real Estate Taxes are deemed to be based on a "Full Assessment") only when a Taxing Authority has, for the purpose of determining the Lessor's liability for Real Estate Taxes, determined a value for the Property taking into account the value of all improvements contemplated for the Property pursuant to the Lease, and issued to the Lessor a tax bill or other notice of levy wherein the Real Estate Taxes for the full Tax Year are based upon such Full Assessment. At no time prior to the issuance of such a bill or notice shall the Property be deemed Fully Assessed.

*Id.* (capitalization and quotes in original).

To initiate the process of establishing the Real Estate Tax Base, Section 4.2.C.3 requires the Lessor to provide the GSA Contracting Officer ("CO") copies of all tax bills, credits, refunds, and notices "which may affect the assessed valuation of the Property, for the Tax Year prior to the commencement of the Lease Term, and all such documentation for every year following." *Id.* at 17. Upon review of these submissions, the CO "may memorialize the establishment of the Real Estate Tax Base by issuing a unilateral administrative Supplemental Lease Agreement indicating the Base Year, the amount of the Real Estate Tax Base, and the Government's Percentage of Occupancy." *Id.*

Under this mechanism, the tax base, which reflects a full assessment of the property by the taxing authority, provides the basis to measure whether GSA owes the Lessor an additional payment to cover an increase in real estate taxes (above the base) or whether the Lessor owes GSA a reimbursement for a decrease in taxes paid (below the base). *See id.* at 16–17 (Section 4.2.C.1). This process is initiated by the Lessor via a request for a tax adjustment. *Id.* at 17 (Section 4.2.C.9).

In late 2013, Plaintiff made several requests to GSA for a tax adjustment and a Supplemental Lease Agreement ("SLA") that memorialized the tax base year as 2012 with an amount of $1,215,930.09. *See, e.g.*, PMSJ Ex. 13 at 3, ECF No. 55-14; PMSJ Ex. 26 at 2–3, ECF No. 55-27.[1] These requests coincided with Plaintiff's separate efforts to sell the property to an outside buyer. PMSJ Ex. 5 at 2, ECF No. 55-6. Plaintiff's requested tax base amount included

---

[1] Plaintiff's requests and proposed drafts SLAs span August 2013 to December 2013. *See* Def.'s Reply Ex. 4 at 2–4, ECF No. 68-4 (August 20, August 22, October 1, October 17, and October 22, 2013, requests); Def.'s Mot. for Summ. J. ("DMSJ") Ex. 14 at 2, ECF No. 60-14 (October 24, 2013, request); PMSJ Ex. 7 at 2, ECF No. 55-8 (October 28, 2013, proposed draft); DMSJ Ex. 15 at 3, ECF No. 60-15 (November 13, 2013, request); PMSJ Ex. 6 at 2, ECF No. 55-7 (November 21, 2013, request); PMSJ Ex. 5 at 2, ECF No. 55-6 (December 9, 2013, request); PMSJ Ex. 8 at 2, ECF No. 55-9 (December 18, 2013, proposed draft); DMSJ Ex. 6 at 4, ECF No. 60-6 (December 18, 2013, reference to a request).

special assessment taxes that GSA believed it was not obligated to pay, such as infestation prevention, leaf collection, transportation, and stormwater.  PMSJ Ex. 17 at 9–14, ECF No. 55-18; ECF No. 55-2 at 16 (Section 4.2.B.2).  After Plaintiff paid the full 2013 tax bill and provided complete proof of its tax payment to Fairfax County on December 17, 2013, GSA issued the lease amendment at issue, SLA7,[2] on January 28, 2014, indicating a tax base year of 2012 and amount of $1,057,010.72 (the amount Plaintiff requested less the special assessment taxes).  *See* DMSJ Ex. 6 at 2–4, ECF No. 60-6; ECF No. 55-2 at 19–20.  Per SLA7, GSA owed Plaintiff a tax adjustment payment of $19,707.63.  ECF No. 55-2 at 20.  The payment was corrected to $33,613.67 in SLA8, but the tax base year and amount remained the same.  ECF No. 55-2 at 22.

The parties continued to use the tax base year and amount, as memorialized in SLA7, for Plaintiff's tax adjustment requests over the course of the next five years.  *Id.* at 23–32.  GSA documented subsequent tax adjustment payments by executing various standard forms, including Lease Amendment and Administrative Action forms.  ECF No. 55-2 at 4–5, 23–32.  Each of these forms utilized the same tax base year (2012) and amount ($1,057,010.72) as found on SLA7.  *See id.*

The final tax adjustment using the 2012 tax base year occurred in February 2019 and resulted in a roughly $ 1 million payment to Plaintiff.  *Id.* at 32.  At that time, a newly assigned CO observed the substantial increase in the tax adjustment payment and decided to investigate the

---

[2] GSA attached an SLA form to the COFD titled "SLA7A" with a handwritten "A" after "SLA7." Although SLA7A is substantially the same as SLA7, except for the "A" notation, Plaintiff claims that GSA never provided it with form SLA7A. ECF No. 55 at 27. Defendant explains the discrepancy in its cross-motion, stating that GSA sent two different SLA7's to Plaintiff, one to reflect an operating cost escalation and the other to effectuate a real estate tax adjustment. ECF No. 60 at 28. GSA staff handwrote the letter "A" on the GSA version of the annual tax adjustment to differentiate it from the annual operating cost escalation. *Id.* The Court uses "SLA7" to refer to both SLA7 and SLA7A.

history of the payments made under the Lease. *Id.* at 5, 32. The CO noticed a significant jump in the tax adjustment amount owed to Plaintiff from tax year 2014 to 2015 ($2,805.24 to $867,039.45). *Id.* at 5, 24, 26. Upon further analysis of tax documentation and discussion with Plaintiff, the CO determined that the building was not fully assessed by Fairfax County in 2013 when Plaintiff requested the initial tax adjustment payment. *Id.* at 5–7. As a result, the CO determined that GSA erroneously established the base year and amount memorialized in SLA7. *Id.* at 7–10.

Based on his review, the CO found that Fairfax County deemed the building fully assessed in 2015, which accounted for the large jump in the tax adjustment payment between 2014 and 2015. *Id.* at 9–10. The CO rejected the notion that GSA agreed to a negotiated tax base in SLA7, finding instead that SLA7 was "a unilateral Government action made in error in reliance on the Lessor's premature request for a Tax Adjustment under the Lease, and erroneous assertion as to the applicable base year." *Id.* at 12. The CO concluded that the tax base year and amount should be revised to reflect the proper fully assessed tax value of the property, and he issued Administrative Action No. 8 to re-establish the tax base year as 2015 with an amount of $1,993,293.46. *Id.* at 10–11, 13. Further, because the error affected six years of tax adjustments, the CO found that GSA overpaid real estate tax adjustments to Plaintiff by $3,413,275.92. *Id.* at 12–13. The CO asked Plaintiff to remit payment within 30 days or GSA would begin withholding a portion of future rent payments until the amount owed was recouped in full. *Id.* at 13.

B. **Procedural Background**

On January 31, 2020, Plaintiff filed its original Complaint appealing the COFD and alleging a breach of contract with respect to GSA's unilateral revision of the tax base. *See* ECF No. 1 at 1–2. Following a lengthy discovery period, Plaintiff filed a First Amended Complaint on

March 10, 2023, adding a count alleging an alternative theory of liability for the breach of contract claim—that is, that the CO erroneously re-established the tax base year as 2015 when Fairfax County fully assessed the property by January 1, 2014.[3]  *See* ECF No. 50 at 3.  The parties then proceeded to brief cross-motions for summary judgment.  *See* PMSJ at 11–12, ECF No. 55; DMSJ at 16–17, ECF No. 60; Pl.'s Reply, ECF No. 63; Def.'s Reply, ECF No. 68.  The Court held oral argument on January 26, 2024.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  R. 56(a), Rules of the United States Court of Federal Claims ("RCFC").  A fact is material when it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine, thus necessitating a trial, when a finder of fact may resolve factual issues in favor of either party.  *Id.* at 250.

"When deciding a summary judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences drawn in the nonmovant's favor."  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 671 (Fed. Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  Where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate.  *Anderson*, 477 U.S. at 248.  "With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered."  *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391

---

[3] Plaintiff's alternative theory is not at issue in the present motions.

(Fed. Cir. 1987)).  Pursuant to Rule 56(c)(3), the Court is not limited to materials only cited by the moving party when considering a summary judgment motion.  RCFC 56(c)(3).  The Court "has discretion to consider other materials in the record when making its determination."  10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2721 (4th ed.).

The moving party bears the burden of proving the absence of a genuine dispute of material fact but "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case."  *Dairyland Power*, 16 F.3d at 1202 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If the moving party meets its initial burden, the nonmoving party must then set out specific facts showing a genuine issue for trial to defeat the motion.  *See Anderson*, 477 U.S. at 250.  The nonmoving party may not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322–23.  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*

## III. DISCUSSION

The parties' cross-motions require the Court to determine whether a genuine issue of material fact exists with respect to the nature and effect of SLA7—*i.e.*, whether SLA7 was a bilateral amendment to the Lease or whether it was a unilateral administrative action implementing the Lease.  Based on a review of SLA7 and other relevant evidence submitted by the parties, the Court finds that summary judgment for Defendant is warranted because the evidence does not, as

Plaintiff argues, demonstrate the formation of a bilateral agreement to establish a negotiated tax base. Rather, undisputed facts show that GSA issued SLA7 unilaterally consistent with the terms of the Lease's tax adjustment provision. However, a genuine dispute of material fact exists with respect to Defendant's request for summary judgment on the element of damages. The plain terms of the Lease entitle Plaintiff to tax adjustments for real estate taxes paid in excess of the tax base, not in excess of the portion of rental payments covering taxes. Plaintiff's alternative theory of breach alleges the CO incorrectly re-established the tax base year as 2015, and thus a triable issue remains.

**A.      SLA7 Was a Unilateral Administrative Action Implementing the Lease, Not a Bilateral Agreement to Amend the Lease.**

Plaintiff and Defendant each argue that there is no genuine factual dispute as to whether SLA7 is a binding bilateral agreement, in Plaintiff's view, or a unilateral administrative action, in Defendant's view. This issue requires the Court to look not only at the four corners of SLA7 but also the communications between the parties leading up to SLA7 and the tax adjustment process contemplated by the Lease to determine if the elements of contract formation are present. Having reviewed the evidence in the record, the Court finds that Plaintiff has not shown that SLA7 on its face is a bilateral contract to amend the Lease with a negotiated tax base. Rather, the Court finds that the totality of evidence shows GSA acted unilaterally to process a tax adjustment pursuant to the Lease. Therefore, the Court must deny summary judgment for Plaintiff and grant summary judgment in favor of Defendant on this issue.

To establish a breach of contract, the Court must first find that a contract exists. *D & N Bank v. United States*, 331 F.3d 1374, 1382 (Fed. Cir. 2003) (The Court cannot "forgo the initial step for proving a breach of contract claim (namely, proving that a contract existed) . . . ."). The basic elements of contract formation with the Government are: "(1) mutuality of intent to contract;

(2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Id.* If a party cannot prove the first requirement, the Court need not reach the subsequent requirements. *Id.* at 1378; *McLeod Grp., LLC v. United States*, 840 F. App'x 525, 527 (Fed. Cir. 2020) ("A failure of any of these [formation] requirements precludes the existence of a valid contract.").

As a "threshold condition" for contract formation, the parties must intend to form a contract. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citations omitted). To find this "mutuality of intent," the Court looks for an "objective manifestation of voluntary, mutual assent." *Id.* (citing Restatement (Second) of Contracts § 18 (1981)); *see also D & N Bank*, 331 F.3d at 1378 (There must be a "clear indication of intent to contract . . . ."). The Court may rely upon "the totality of the factual circumstances" surrounding the parties' interactions to find intent. *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990), *op. modified on reh'g* (Mar. 19, 1991). Thus, the Court is not bound solely by the face of the contract in making this determination. *See Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1365 (Fed. Cir. 2005) (citing evidence including "correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreements" showing the party's intent to contract).

1.     <u>The Face of SLA7 Alone Does Not Establish Intent to Form a Bilateral Contract.</u>

Plaintiff argues the Court need not and should not look outside the four corners of SLA7 to determine its nature or effect because the form "clearly demonstrates mutuality of intent to contract, lack of ambiguity in offer and acceptance, and consideration."[4]   ECF No. 55 at 36.

---

[4] There is no dispute that an authorized Government official appropriately executed SLA7 on behalf of GSA.  ECF No. 55 at 38; ECF No. 60 at 20 n.5.

According to Plaintiff, SLA7 "on its face" is a bilateral amendment to the Lease establishing a negotiated tax base, which GSA cannot unilaterally undo. *Id.* at 30.

To support this assertion, Plaintiff relies heavily on boilerplate text in the standard form. For example, Plaintiff highlights that the form introduces itself as an "AGREEMENT" between the parties "to amend the above Lease." PMSJ Ex. 9 at 2, ECF No. 55-10. Additional standard language stating that the parties "covenant and agree that the said lease is hereby amended as follows" precedes the language added by GSA to memorialize the tax base. *Id.* In Plaintiff's view, this is sufficient proof of mutuality of intent to bilaterally amend the Lease, notwithstanding Defendant's evidence to the contrary. ECF No. 55 at 34. Similarly, Plaintiff asserts that by GSA signing SLA7 and emailing the form to Plaintiff, the agency "indisputably created an offer that invested [Plaintiff] with the power of acceptance." *Id.* The offer, according to Plaintiff, contained a tax base year of 2012, a base value set at $1,057,010.72, and a tax adjustment of $19,707.63 owed to Plaintiff. *Id.* at 34–35. Plaintiff asserts that its signature in the standard form signature block signaled acceptance of the offer to amend the Lease with this negotiated tax base year and amount.[5] *Id.* at 35. As for an exchange of consideration, Plaintiff asserts that the plain language of SLA7, which refers to "the considerations herein," is proof that this element of contract formation is established. ECF No. 63 at 16. Although not stated in the form, Plaintiff contends the purported consideration was a "promise for a promise" between the parties to bilaterally establish the tax base and "waive any argument that the amount should be different." *Id.* at 17.

---

[5] Plaintiff additionally argues that its signing SLA7 resulted in acceptance because GSA did not explicitly tell Plaintiff it need not sign the form. ECF No. 55 at 36–37 ("Defendant did not say a word to Plaintiff about SLA7 not requiring Plaintiff's signature or it not being a bilateral amendment to the Lease.").

While Plaintiff has shown a "cloud of evidence that *could be* consistent with a contract," it has not shown enough to demonstrate the absence of a genuine factual dispute as to whether the parties intended SLA7 to be a contract. *D & N Bank*, 331 F.3d at 1377 (emphasis added). First, reliance on the boilerplate language of this standard form is not dispositive of the issue because Section 4.2 of the Lease expressly contemplated that GSA could "memorialize the establishment of the Real Estate Tax Base by issuing a *unilateral administrative Supplemental Lease Agreement* indicating the Base Year [and] the amount of the Real Estate Tax Base[.]" ECF No. 55-2 at 17 (Section 4.2.C.3) (emphasis added). As Defendant explained, the language and signature boxes on SLA7 were "standard across all SLAs" used by GSA and did not hold unique meaning for the present Lease. ECF No. 60 at 23. Thus, notwithstanding the plain language indicating that the form represents an "agreement," the Lease entered into by the parties approves the use of the form to effectuate a unilateral administrative action. While the Court questions whether use of such a form was good agency practice in this circumstance, for purposes of Plaintiff's motion, the Lease's approval of such use undermines the contention that SLA7 on its face could only be construed as a bilateral contract.

Second, the non-standard language that GSA added to SLA7 does not show that the parties agreed to amend the *process* set forth in the Lease for establishing the tax base. The language does not identify the tax base established in SLA7 as a negotiated tax base, nor does the language qualify that it is an amendment of Section 4.2. ECF No. 55-10 at 2. Rather, in conformance with the process set forth in the Lease, SLA7 indicates it was "[i]ssued to reflect the annual real estate tax escalation *provided for* in the basic lease agreement." *Id.* (emphasis added). Consistent with the terms of Section 4.2, SLA7 indicates the base year, the amount of the tax base, the percentage owed by GSA based on occupancy, and the tax adjustment payment owing to Plaintiff. *Compare*

12

ECF No. 55-10 at 2 *with* ECF No. 55-2 at 17 (Section 4.2.C.3).  It then expressly states, "All other terms and conditions of the lease shall remain in force and effect."  ECF No. 55-10 at 2; *see also NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1162 (Fed. Cir. 2021) (finding that this same provision on a similarly worded SLA shows that the term of the lease "still governs").  Far from showing that the parties intended to deviate from the Lease to establish a tax base by agreement, the non-boilerplate language of SLA7 is more consistent with an intent to follow the Lease's terms.[6]

These facts distinguish the present dispute from the decision in *Woodies Holdings, LLC v. United States* ("*Woodies I*"), 115 Fed. Cl. 204 (2014).  In *Woodies I*, the court found that a similar SLA evidenced GSA's intent to enter a bilateral agreement with the lessor setting a negotiated tax base by which to calculate real estate tax adjustments provided for in the lease.  *Id.* at 207–08.  Plaintiff argues that both the language and the placement of the signature blocks on SLA7 evidenced a similar intent here.  Oral Arg. Hr'g Tr. at 3:23–8:14, ECF No. 71.  The lease in *Woodies I*, however, contemplated a different process for determining the tax base.  Specifically, the tax base in that case was "defined as either taxes for the first 12-month period coincident with full assessment, or an amount *negotiated by the parties* that reflects an *agreed-upon base* for a fully assessed value of the property."  *Woodies I*, 115 Fed. Cl. at 211 (emphasis added).  The plaintiff in *Woodies I* argued that the parties engaged in communications proposing different ways to calculate the tax base, reached an agreement, and memorialized the agreement in an SLA.  *Id.* at 212.  The

---

[6] Defendant argues that the face of SLA7 also does not establish the other elements of contract formation.  ECF No. 60 at 21, 30–31 (contending that SLA7 is not an offer and does not invite acceptance, and that the mere use of the word "considerations" on SLA7 "is not sufficient to establish consideration").  Because SLA7 alone does not demonstrate the first element of contract formation (*i.e.*, intent), the Court need not analyze the remaining elements.  *D & N Bank*, 331 F.3d at 1378.

court held that "[t]he sole purpose of the SLA at issue was to fix the comparison (current) year taxes as against the base year," *id.*, consistent with the parties' "contract[ual] rights to agree on a base year for calculating real estate tax adjustments," *id.* at 214.  Considering the tax adjustment provision of the lease, the evidence of the parties' negotiations, the language of the SLA, and the parties' subsequent conduct, the Court held as a matter of law that the parties' reached a bilateral agreement.  *Id.*

Here, the Lease does not contemplate the parties' right to negotiate a tax base.  To the contrary, the tax base is defined in one of two ways, depending on when the property is fully assessed by the tax authority.  ECF No. 55-2 at 16 (Section 4.2.B.7).  It also specifically authorizes GSA to establish the tax base by issuing a "unilateral administrative [SLA]."  *Id.* at 17 (Section 4.2.C.3).  Moreover, the court's holding in *Woodies I* did not rely solely on the boilerplate language of the SLA at issue there to determine it was a bilateral agreement, but instead considered a range of facts beginning with evidence of the parties' negotiations.  115 Fed. Cl. at 212.  And ultimately the court found that the process followed by the parties reflected the process set forth in the lease.  *Id.* at 214 ("The [base year] figures on which plaintiff relies today . . . were initially proposed by GSA for no purpose other than implementing the tax adjustment under clause 3.2 of the lease. Plaintiff agreed to them.").  Plaintiff argues for the opposite result here.

Plaintiff's reliance on *DeMarco Durzo Development Co. v. United States*, 69 Fed. Cl. 262 (2005), is also misplaced.  In *DeMarco*, the court found that the "standard Government form language" in the SLA at issue "evidenced the parties' intent" to amend the original lease with respect to the lease's renewal option.  69 Fed. Cl. at 272.  The SLAs analyzed by the *DeMarco* court contained added language stating both the specific lease provisions that were being amended and a description of how they were being amended.  *See, e.g.*, *id.* at 267–68 ("E. Paragraph 5 of

14

the Lease is amended by deleting the existing text and inserting in lieu their [sic] of the following: . . . ." (alteration in original)).  The specific, non-standard language added by the parties provided the *DeMarco* court a clear indication of the parties' intentions.  *Id.* at 273 ("Therefore, SLA No. 5 . . . like each of the thirteen SLA's, evidenced the parties' intent to amend the October 2, 1984 original Lease, by deleting and inserting text into the original Lease, rather than an intent to enter into a new lease.").

As noted above, no such qualifiers exist in SLA7.  Plaintiff embraces that fact, asserting that since GSA placed "no qualifiers" limiting SLA7's language, GSA intended to amend the *entire* lease.  ECF No. 63 at 6; *id.* at 7.  It follows, Plaintiff argues, that GSA did not preserve the ability under Section 4.2 of the Lease to unilaterally change the tax base or require full assessment of the property prior to establishing the tax base.  *Id.* at 6–7; *see also* ECF No. 55 at 35–36 ("As a bilateral amendment to the Lease, SLA7 and the Real Estate Tax Base that it established is designed to be used throughout the Lease . . . and the Defendant cannot unilaterally negate the effect of that bilateral amendment . . . .").  The Court, however, cannot infer that the parties intended SLA7 to silently negate a key provision of the Lease, and the clear indication of what was amended in the SLA in question in *DeMarco* stands in stark contrast to SLA7.

Accordingly, SLA7's plain language does not show an intent to enter a bilateral agreement that amends the entire Lease.

2.    <u>Extrinsic Evidence In the Record Shows That SLA7 Was Intended to Be a Unilateral Action.</u>

Defendant relies on various pieces of extrinsic evidence to support its argument that the parties intended SLA7 to function as a unilateral administrative action effectuating a tax adjustment payment in accordance with the Lease.  Based on the "totality of the factual circumstances" surrounding the execution of SLA7, *Texas Instruments*, 922 F.2d at 815, the Court

agrees.  Looking at the evidence in the light most favorable to Plaintiff, there is no genuine dispute of material fact that the parties intended SLA7 to be a unilateral action that did not amend the process for establishing the tax base under the Lease.

First, as discussed above, the Lease expressly contemplates that GSA may establish the tax base through a unilateral administrative SLA.  ECF No. 55-2 at 17 (Section 4.2.C.3).  It does not contemplate the parties agreeing to a negotiated tax base.  *Id.* at 16 (Section 4.2.B.7).  Rather, the determination of the tax base is dependent on when Fairfax County fully assessed the property.  *Id.* That is not say that the parties could not have bilaterally agreed to provide themselves the option of an agreed-to tax base, but the evidence in the record does not show they did.

Second, the communications leading up to the execution of SLA7 show that the parties were attempting to implement Section 4.2 of the Lease, not negotiate an agreement to avoid it. The communications began in August 2013 when Plaintiff made its initial request for a real estate tax adjustment.  As the correspondence reflects, Plaintiff submitted its request in accordance with Section 4.2 of the Lease.  ECF No. 55-14 at 3; Def.'s Reply Ex. 4 at 3, ECF No. 68-4.  In October 2013, Plaintiff submitted a request for GSA to issue a "unilateral administrative [SLA] . . . establishing the real estate tax base year" as December 5, 2011, through December 5, 2012, with a base amount of approximately $1.2 million.  DMSJ Ex. 14 at 2, ECF No. 60-14; *see id.* at 3–4. Although the letter itself did not expressly refer to the Lease, the request conforms to Section 4.2's provision for issuing a unilateral SLA.  *Compare id.* at 3 *with* ECF No. 55-2 at 17 (Section 4.2.C.3). A few days later, Plaintiff sent GSA a draft SLA.  ECF No. 55-27 at 3.  Both the request letter and draft represented that the property was fully assessed as of the proposed tax base year.  *Id.*; ECF No. 60-14 at 3; *see* PMSJ Ex. 7 at 2, ECF No. 55-8 (separate version of draft SLA representing the property was fully assessed "as defined in the lease").  Plaintiff clarified in November 2013 that

the draft SLA was not meant to amend the Lease, but rather effectuate the process laid out in Section 4.2.C.3.  DMSJ Ex. 15 at 2, ECF No. 60-15 (stating its understanding that "the issuance of such an SLA is rather routine").  That point was further brought home in an email to GSA from Plaintiff's representative, who explained that Plaintiff's draft SLA was "only" seeking a specific tax base number.  ECF No. 60-6 at 3 (stating that "even if everything else is struck from the attached, we only need to state the real estate tax base is $1,215,930.09").  This was critical to Plaintiff only because it was attempting to sell the property and needed the tax base information to satisfy potential buyers.  *See, e.g.*, ECF No. 55-6 at 2.

Although the parties exchanged numerous communications that Fall related to Plaintiff's request, the exchanges do not show a contract negotiation.  Instead, the record shows that Plaintiff repeatedly requested that GSA sign the draft SLA, and GSA declined to do so.  *See, e.g.*, ECF No. 55-27 at 2–3; ECF No. 55-6 at 2; PMSJ Ex. 8 at 2, ECF No. 55-9; ECF No. 60-6 at 3–4.  GSA's position was that the draft SLA included special taxes in the proposed tax base amount that contravened its policy for reimbursements and the request itself was outside of normal GSA procedure that provided for setting the tax base with the first tax adjustment, not prior to it.  ECF No. 55-5 at 23 (Section 4.2.B.2); ECF No. 60-15 at 2.  Contrary to Plaintiff's characterization, GSA's internal communications show its deliberations about the procedural concerns raised by Plaintiff's requests, not objective indicators of a negotiation preceding contract formation.  ECF No. 60-6 at 3–4; PMSJ Ex. 6 at 2, ECF No. 55-7; DMSJ Ex. 11 at 4  (Beverly Tr. 63:12–64:19) (explaining that she sought legal advice within the agency because Plaintiff's proposed tax base amount included special taxes), 14 (Beverly Tr. 175:9–19) (explaining the "normal practice" for issuing the first tax adjustment stating the tax base), ECF No. 60-11; *see Rex Sys., Inc. v. Cohen*,

224 F.3d 1367, 1372–73 (Fed. Cir. 2000) (finding objective evidence that contract negotiations were ongoing).[7]

GSA ultimately processed Plaintiff's tax reimbursement request in January 2014 after receiving complete information on Plaintiff's 2013 real estate tax payments, issuing SLA7 to effectuate the tax adjustment pursuant to the terms of the Lease.[8]   *See* ECF No. 60-6 at 4; ECF No. 55-10 at 2; DMSJ Ex. 12 at 2–3 (Decl. of Oluseyi Gbadegesin ¶¶ 6–8), ECF No. 60-12.   The non-boilerplate text of SLA7 did not adopt the substantive language or format of any of the drafts submitted by Plaintiff.   *Compare* ECF Nos. 55-8, 55-9, 55-27 *with* ECF No. 55-10.

Plaintiff has not shown at any point prior to GSA issuing SLA7 that the parties' communications switched from discussing a unilateral administrative action to negotiating a bilateral amendment.   And Plaintiff simply stating that a bilateral amendment is "what the parties did" is not sufficient to show a genuine factual dispute as to whether a negotiation took place.   ECF No. 63 at 14; *see Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1140 (Fed. Cir. 2021) (explaining that summary judgment cannot be defeated "'with conclusory allegations, unsupported assertions, or only a scintilla of evidence'" (quoting *Batiste v. Lewis*, 976 F.3d 493,

---

[7] Plaintiff asserts that the GSA "internally confirmed" that the parties to the Lease had the ability to negotiate a tax base, even if the Lease did not specifically provide for this, based on the principle of freedom of contract.   ECF No. 55 at 39; *see also* ECF No. 63 at 7 n.3.   Assuming this is the proper interpretation of the advice given by GSA's counsel, that does not compel the conclusion that GSA's subsequent actions were in furtherance of that advice.   Even in the light most favorable to Plaintiff, the evidence shows otherwise.

[8] Notably, prior to submitting its first draft SLA, Plaintiff received advice and comments from a CBRE managing director, who stated—based on her reading of the Lease—that "[t]he base year will be 12/5/2011-12/4/2012" and "the base year expense [is] $1,057,047.66."   Def.'s Reply Ex. 5 at 2, ECF No. 68-5; *id.* at 7 (recommending the removal of the special assessment taxes because GSA pays only ad valorem taxes).   Her calculation was about $37 off, but the estimate supports the conclusion that the tax base amount stated in SLA7 was simply GSA's application of the Lease's definition of the tax base (premised on the erroneous representation that the property was then fully assessed), not a negotiated compromise between the parties.

500 (5th Cir. 2020))).  Not only does Plaintiff not provide any evidence demonstrating that the parties discussed a bilateral amendment, but Plaintiff's argument also effectively proves the opposite point—that the parties intended a unilateral action consistent with the Lease.  ECF No. 63 at 13 (attempting to draw a distinction between discussing a unilateral SLA *during contract negotiations* as opposed to what was bilaterally agreed to *in the contract*).

Other evidence offered by Plaintiff includes a declaration of Plaintiff's Vice President, Vincent Forte, submitted in support of its summary judgment request.  Mr. Forte's declaration states the parties engaged in negotiations "for months" over the tax base.  PMSJ Ex. 23 at 3 (Decl. of Vincent Forte ¶ 8), ECF No. 55-24.  But Mr. Forte admitted in deposition testimony that the tax base year was a term of the existing lease and that GSA established the tax base year reflected in SLA7 as contemplated by the Lease.  *See* DMSJ Ex. 10 at 3 (V. Forte Tr. 29:9–22) ("[The tax base year] wasn't a negotiable point within the confines of our negotiation with the government to procure this lease."), 5 (V. Forte Tr. 56:14–57:10) ("Q: What is your understanding of how the real estate tax base was determined in SLA 7? A: It's established by the lease."), ECF No. 60-10.  For purposes of a summary judgment motion, when a later declaration contradicts prior deposition testimony, the party "has the duty to provide a satisfactory explanation for the discrepancy." *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992), *abrogated in part on other grounds Pfaff v. Wells Elecs.*, 525 U.S. 55, 67–68 (1998).  Plaintiff has not provided any explanation of this discrepancy, either in Mr. Forte's declaration or in its briefing materials.  The result is that the Court may disregard Mr. Forte's declaration.  *Grand Acadian, Inc. v. United States*, 87 Fed. Cl. 193, 206 (2009) ("Courts generally give a deposition more weight because there was an opportunity for cross-examination absent in an affidavit." (quoting 11 James Wm. Moore, Moore's Federal Practice § 56.14[1][f], at 56–179 (3d ed. 2004))).  Even assuming no discrepancy,

the Federal Circuit has found that "[a] self-serving reference to 'negotiations,'" such as the one in Mr. Forte's declaration, "does not suffice to prove intent to contract on the part of the government." *Suess v. United States*, 535 F.3d 1348, 1364 (Fed. Cir. 2008) (alteration added).

Mr. Forte's declaration, as well as the declaration submitted by another GBA Vice President, Gregory Forte, also attest to their understanding of what SLA7 was. Specifically, both declarants state that they believed SLA7 to be GSA's "offer[] to bilaterally amend the Lease to set the Base Year of the Lease as 2012 for the duration of the Lease . . . ." ECF No. 55-24 at 3 (V. Forte Decl. ¶ 7); *see* PMSJ Ex. 24 at 3 (Decl. of Gregory Forte ¶ 6), ECF No. 55-25. This understanding was largely based on their reading of the document (which the Court has rejected) and the fact that no one at GSA told them it was not a bilateral contract and did not need to be counter-signed. *See* ECF No. 55-24 at 3–5 (V. Forte Decl. ¶¶ 8–10, 12–14); ECF No. 55-25 at 3–5 (G. Forte Decl. ¶¶ 7–9, 11–13). Again, neither declaration addresses the contemporaneous communications leading up to the issuance of SLA7, in which Plaintiff requested a unilateral administrative SLA *using the same form* and acknowledged that it did not seek to amend the Lease. *See* ECF No. 60-14 at 2; ECF No. 60-15 at 2. While this evidence attempts to raise a dispute, the dispute is not a genuine one. *See Anderson*, 477 U.S. at 250. Regardless, even accepting the Forte declarations in the light most favorable to Plaintiff, this evidence cannot demonstrate a genuine dispute of material fact with respect to what GSA intended SLA7 to be. It is Plaintiff's burden to prove "mutuality of intent" through an "objective manifestation of voluntary, mutual assent." *Anderson*, 344 F.3d at 1353. Given the undisputed evidence in the record showing GSA's intent to follow (not amend) the Lease through the issuance of SLA7, the Forte declarations are not sufficient to save Plaintiff's claim from summary judgment.

Finally, the parties' course of dealings shows that they intended SLA7 to be a unilateral administrative action. GSA sent SLA7 to Plaintiff with a cover letter stating that it reflected a lump sum payment for tax escalation "[i]n accordance with the basic lease agreement." DMSJ Ex. 7 at 7, ECF No. 60-7. The copy attached was executed by GSA, but the cover letter did not request any signature by Plaintiff. *Id.* Instead, it instructed Plaintiff to "retain this copy for your files." *Id.*; *see* PMSJ Ex. 11 at 2, ECF No. 55-12 (substantially similar letter transmitting SLA8, which corrected the adjustment amount in SLA7). By contrast, when executing prior forms that required Plaintiff's signature, GSA instructed Plaintiff to execute the form first and return the copy for final execution by GSA. *See* DMSJ Ex. 17 at 2, ECF No. 60-17 (transmitting SLA4 for execution); *see also* DMSJ Ex. 18 at 2, ECF No. 60-18 (transmitting fully executed copy of SLA2). Further supporting the conclusion that Plaintiff's acceptance or signature was not required, GSA processed the payment for Plaintiff's initial tax adjustment on the same day that it executed SLA7. DMSJ Ex. 4 at 4 (Decl. of Kevin Morrison ¶¶ 6–7), ECF No. 60-4; *see id.* at 8. All of this occurred before Plaintiff signed and returned SLA7 *over two months later*. PMSJ Ex. 12 at 2, ECF No. 55-13.

Plaintiff argues that the parties' subsequent course of dealings shows an intent to form a bilateral amendment to the Lease because GSA honored the tax base memorialized in SLA7 for six years. ECF No. 55 at 20–26, 36; ECF No. 63 at 8–9. This is not dispositive as to mutuality of intent because the Lease itself contemplated the setting of a tax base (as defined by the Lease) to use for tax adjustment purposes during the term of the Lease. ECF No. 55-2 at 16–17 (Sections 4.2.B.7, 4.2.C.1). GSA could establish that tax base by a unilateral administrative SLA. *Id.* at 17 (Section 4.2.C.3). The only reason the tax base year changed (again, unilaterally) is because the CO determined in 2019 that it was prematurely established in SLA7 before the property was fully assessed, as is required by the Lease. ECF No. 55-2 at 13.

Moreover, rather than standing out as a clear departure from the tax adjustment process set forth in the Lease, comparison of SLA7 to the subsequent tax adjustment actions shows that it is largely indistinguishable.  Although processed on different types of forms, each tax adjustment for tax years 2014 through 2018 used substantially the same format to document the calculation.  *See id.* at 24, 26, 28, 30, 32.  Some forms were identified as lease amendments, using substantially the same language as SLA7, and included a signature block for Plaintiff.  *See id.* at 24, 26.  If the Lease was amended by SLA7 in the way Plaintiff contends, there would be no need for any further amendments regarding the tax base.  And if the language of SLA7 were vital to its bilateral nature, as Plaintiff argues, then it is curious that GSA used the same language to effect what are merely administrative reimbursement actions.  It is also worth noting that—contrary to the concept of a negotiated base—GSA increased the amount of the tax base for the tax adjustments related to tax years 2017 and 2018, without any apparent agreement or objection by Plaintiff.  *Id.* at 30, 32.

Accordingly, the undisputed evidence in the record shows that SLA7 (1) reflects a tax base year and amount determined by GSA pursuant to the Lease and its policy of not reimbursing special assessment taxes and (2) was the result of the parties interacting according to the Section 4.2 process, not a negotiation preceding contract formation.

*        *        *

In sum, the Court finds that the face of SLA7 does not show the parties' intent to execute a bilateral amendment of the Lease setting a negotiated tax base.  Plaintiff has thus "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case"— specifically, the first element of contract formation, intent.  *Celotex*, 477 U.S. at 322–23; *see Dairyland Power*, 16 F.3d at 1202.  To the contrary, considering the totality of the evidence and viewing it in the light most favorable to Plaintiff, there is no genuine dispute of material fact that

the parties' intent was to issue SLA7 as a unilateral administrative SLA per the Lease.  Therefore, the Court must deny summary judgment to Plaintiff and grant summary judgment for Defendant on this issue.

**B.      Defendant Cannot Show a Lack of a Genuine Factual Dispute Over Damages.**

Whether based on SLA7 or Plaintiff's alternative theory, Defendant argues that Plaintiff cannot prove a breach of contract claim because Plaintiff cannot establish damages.  ECF No. 60 at 43.  Defendant, however, does not use the correct measure of damages to determine whether Plaintiff has suffered harm.

A claimant alleging breach of contract must establish that there was "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  Even if a breach is established, the party alleging breach must show damages by more than simply claiming harm to that party.  *See Automed Techs., Inc. v. Microfil, LLC*, 244 F. App'x 354, 361 (Fed. Cir. 2007) (Plaintiff must provide a "basis to quantify any harm suffered as a result of the breach.").  Generally, the measure of damages for a breach of contract is that which is required to "compensate the injured party for lost expectation" of the contract.  *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003) (quoting 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed.1998)); *see also Northrop Grumman Computing Sys., Inc. v. United States*, 823 F.3d 1364, 1368 (Fed. Cir. 2016).  Expectation damages may be recovered if the damages are "(1) actually foreseen or reasonably foreseeable, (2) caused by the breach of the promisor, and (3) proved with reasonable certainty." *Eby v. United States*, 823 F. App'x 933, 935 (Fed. Cir. 2020).  Such damages put the non-breaching party in "as good a position as [it] would have been in had the contract been performed." *S. Cal.*

*Fed. S&L Ass'n v. United States*, 422 F.3d 1319, 1334 (Fed. Cir. 2005).   Similarly, the non-breaching party, when seeking damages, may not "achieve a position superior to the one it would reasonably have occupied had the breach not occurred."  *LaSalle Talman Bank*, 317 F.3d at 1371.

Plaintiff alleges that it has suffered $7,158,406.88 in damages due to GSA's alleged breach of the Lease.[9]   ECF No. 55 at 42.   In response, Defendant argues that Plaintiff has suffered no harm, and thus has no damages, because it has received "more in real estate tax payments through its rent and tax adjustments than [Plaintiff] has paid in real estate taxes to Fairfax County," thereby preventing any valid claim for damages.   ECF No. 60 at 43–44.   According to Defendant, the shell rent payments (which include an amount to cover estimated taxes) and net annual tax adjustments that GSA paid Plaintiff exceed Plaintiff's actual real estate taxes by roughly $4.2 million.  *Id.* at 46 (asserting that GSA has paid Plaintiff $22.1 million for taxes, whereas Plaintiff has only paid $17.9 million to Fairfax County for real estate taxes through 2021); *see also* DMSJ Ex. 28 at 11–12 (Decl. of A. Mark Gmyr ¶¶ 20–21), ECF No. 60-28.   Roughly 95 percent of the $22.1 million has come from the annual shell rent alone.   ECF No. 60-28 at 92 ("Annual Lease Payments" column); *see also* ECF No. 60 at 46 n.17.   Therefore, under any theory of recovery, Defendant argues that Plaintiff would wrongfully receive a "windfall" of additional overpayments for real estate taxes.   ECF No. 60 at 46–47.   Such a windfall, Defendant claims, goes against the purpose

---

[9] To reach this number, Plaintiff claims that GSA has improperly withheld $3,413,275.92 from its rental payments to recoup alleged real estate tax overpayments for tax years 2013 through 2018, and that GSA has underpaid the tax adjustments for tax years 2019 through 2022, resulting in $3,745,130.96 in damages.   ECF No. 55 at 41.   The alleged damages represent the difference between the tax base memorialized in SLA7 (2012) and the tax base established in the COFD (2015).  *Id.*  If it succeeds in showing a breach under its alternative theory, Plaintiff claims damages in the amount of "all annual Unadjusted Real Estate Taxes incurred after 2014" over the amount of the alleged correct tax base year based on full assessment (2014; $1,059,815.96), as opposed to the amount of the tax base year established in the COFD (2015; $1,993,293.46).  *See* ECF No. 50 at 32 ("Prayer for Relief").

of the tax adjustment provision in Section 4.2, which is to "account for the increases and decreases in real estate taxes after the establishment of the real estate tax base." *Id.* at 47; *see id.* at 31; *see also* ECF No. 55-5 at 23–24.

The problem with Defendant's argument is that its approach to measuring damages in this dispute compares the amount of taxes covered by the rent payments and the net tax adjustments to the amount of taxes actually paid by Plaintiff. This is not how the Lease intended tax adjustments to be determined, and it is the tax adjustment provision of the Lease that GSA allegedly breached. *See LaSalle Talman Bank*, 317 F.3d at 1371 (proper measure for damages is the lost expectation of the contract). Section 4.2 of the Lease provided for tax adjustments based upon the difference between the *tax base year* and the taxes actually paid by Plaintiff. ECF No. 55-2 at 16 (Section 4.2.C.1). Had GSA wanted to prevent windfalls from tax adjustments that exceed the estimated taxes covered by the annual rent, it could easily have written the tax adjustment provision in that way. It did not. Instead, the expectation of the contract with respect to taxes is that GSA would reimburse Plaintiff for real estate taxes via: (1) the estimate of real estate taxes incorporated into the shell rent, *and* (2) the tax adjustment procedure outlined in Section 4.2 of the Lease, which is premised on the establishment of a tax base. ECF No. 55-5 at 18, 23–24. To the extent GSA has not paid Plaintiff the full tax adjustment contemplated by Section 4.2 based on the correct tax base, it has suffered expectation damages, and compensating Plaintiff for that loss would be fully consistent with the stated purpose of the provision. *See S. Cal. Fed. S&L*, 422 F.3d at 1334.

The correct measure of Plaintiff's damages, if any, depends upon whether the COFD correctly established the tax base year and amount in accordance with Section 4.2, which ultimately boils down to a question of when the property was fully assessed by Fairfax County. Plaintiff's alternative breach theory raises a genuine factual dispute about that very question, and

each party has provided competing evidence about when Fairfax County designated the property fully assessed on which the Court could resolve the issue "in favor of either party." *Anderson*, 477 U.S. at 250; *see* ECF No. 60 at 36–40 (exhibits cited therein); *see also* ECF No. 63 at 17–22 (exhibits cited therein).  Because Defendant's argument is not grounded on the proper legal standard for damages and because material facts remain in dispute, the Court must deny summary judgment for Defendant on the question of damages.

## IV.    CONCLUSION

Based on the foregoing, the Court finds no genuine dispute of material fact regarding SLA7, which was intended to be a unilateral administrative action consistent with the Lease, not a bilateral amendment to the Lease.  There remains, however, a genuine dispute of material fact on the question of damages, which will depend upon further findings related to the full assessment date of the property.  Therefore, the Court **DENIES** Plaintiff's Motion (ECF No. 55), and **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion (ECF No. 60).  The parties shall submit a joint status report by no later than April 30, 2024, including a proposal for further proceedings.

**SO ORDERED.**


Dated: April 16, 2024                        */s/ Kathryn C. Davis*
                                             KATHRYN C. DAVIS
                                             Judge