**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____

|  |  |  |
|---|---|---|
| GBA ASSOCIATES LIMITED PARTNERSHIP, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 20-116 |
| v. | ) ) | Filed: September 19, 2025 |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

_____

## OPINION AND ORDER

This breach-of-contract case arises from the administration of a July 2010 lease ("the Lease") that the General Services Administration ("GSA") entered into with GBA Associates Limited Partnership ("Plaintiff") for an office building occupied by the United States Department of Defense, Defense Health Agency. The property consists of several parcels and associated buildings located at 7700 Arlington Boulevard, Falls Church, Virginia ("the Property"). Pursuant to the Lease, Plaintiff substantially renovated the Property's facilities. Because the parties expected the renovations to cause a significant increase in the Property's value, the Lease provided that the "Real Estate Tax Base" would be established in the first full tax year for which taxes were based on a "Full Assessment" of the Property coincident with full occupancy. Under the Lease, the Property was deemed "Fully Assessed" when the local taxing authority—in this case, the County of Fairfax ("Fairfax County" or "the County")—assessed the Property's tax liability taking into account the value of all improvements contemplated by the Lease. The Real Estate Tax Base would be used during the life of the Lease to calculate any adjustment for changes in property taxes. That is, after the establishment of the Real Estate Tax Base, if Fairfax County issued a real estate tax bill above that base tax amount, the Lease required GSA to reimburse Plaintiff for its

share of any excess tax payment. Conversely, if the County issued a real estate tax bill below that base tax amount, GSA would receive its share of the decrease.

Renovations to the Property were complete by, at the latest, October 2012. In August 2013, after receiving Fairfax County's 2012 property tax assessment and bill, Vincent Forte, Plaintiff's president, requested a tax adjustment from GSA premised on the Real Estate Tax Base being established as the 2012 tax year. GSA subsequently executed a supplemental lease agreement establishing the tax base year as 2012, and it issued adjustment payments to Plaintiff for the next six years using that tax base amount. This was true even after the County's assessed value of the Property increased substantially in 2015, leading to a tax bill that exceeded the 2012 tax base by $867,000 and resulting in a significantly increased adjustment payment from GSA to Plaintiff. Assessments in the following tax years were similarly high.

In 2019, the new GSA lease contracting officer responsible for managing the lease, Kevin Morrison, concluded that the County's 2012 tax assessment did not reflect the value of all renovations contemplated by the Lease, and he notified Plaintiff that the tax base should have been set at the tax liability amount reflected in the 2015 tax bill. GSA then reestablished the tax base year as 2015 and withheld rent payments to recoup what it believed it had overpaid. The unilateral correction of the Real Estate Tax Base and the subsequent rent withholding forms the basis of Plaintiff's allegation that GSA breached the Lease. The Court resolved part of Plaintiff's claim on summary judgment, holding that GSA unilaterally established the initial Real Estate Tax Base in the course implementing the Lease, that the parties did not bilaterally agree to use 2012 as the tax base year in lieu of following the Lease's procedures for establishing the tax base, and that GSA was authorized to correct the premature establishment of the tax base. The question that remained for trial was whether GSA correctly reestablished the tax base year as 2015, which raises the

2

factual question of when Fairfax County first issued a tax bill for the Property that reflected the value of all renovations contemplated by the Lease.  Plaintiff presented evidence to support its claim that full assessment occurred in tax year 2013 or 2014.  The Government presented evidence supporting Mr. Morrison's conclusion that full assessment occurred in tax year 2015.

The Court held a five-day trial from December 9, 2024, through December 13, 2024, hearing testimony from six fact witnesses and three experts (one for Plaintiff and two for the Government).  The parties completed post-trial briefing on April 1, 2025, and gave closing arguments on April 11, 2025.  Upon consideration of the evidence and arguments presented, and for the reasons explained below, the Court finds that Fairfax County did not take into account the value of all renovations contemplated by the Lease in its assessment of the Property until the 2015 tax year, meaning the Property was not "Fully Assessed" under the Lease until 2015.  Accordingly, GSA acted properly in reestablishing the base tax year based on the County's 2015 assessment and did not violate the Lease by withholding rental payments to recoup the amount of the tax adjustments it paid in excess of what the Lease required.  The Court declines to order damages under Plaintiff's alternative theory that the County's 2015 assessment used an incorrect valuation method.

## BACKGROUND

### I.    Findings of Fact[1]

The following findings of fact trace the history of the parties' dealings from the inception of the Lease to the initiation of this lawsuit.

---

[1] Other findings of fact pursuant to Rule 52(a) of the Rules of the United States Court of Federal Claims and rulings on mixed questions of fact and law are set forth later in the analysis.

### A.     Negotiation, Award, and Terms of the Lease

In 2009, GSA began to search for a property to serve as an integrated location for various health system components of the Department of Defense's Joint Medical Command (the Property later became known as the Defense Health Headquarters of the Defense Health Agency).  GSA Lease File at 838, 1033, 1420, JX 230; *see also* G. Forte, Tr. at 253:11–15.[2]  Plaintiff, through then-Vice President Vincent Forte, responded to GSA's solicitation with a lease proposal on February 9, 2010.  JX 230 at 842–44; *see also* G. Forte, Tr. at 253:10–21.  Plaintiff's property occupies roughly 44 acres just inside the Washington Capital Beltway in Falls Church, Fairfax County, Virginia, and includes an "integrated campus" of three contiguous buildings.  JX 230 at 685; *see id.* at 842.  In its response to GSA's Solicitation for Offers, Plaintiff proposed "extensive" building renovations to the three buildings on the Property in order to meet the Government's specifications.  *Id.* at 685; *see id.* at 685–92; *see also* V. Forte, Tr. at 150:1–14.  The renovations would be so substantial as to result in completely "gut[ting]" the interiors of the buildings on the Property.  V. Forte, Tr. at 52:10–25.  After discussions with GSA representatives, *see* JX 230 at 1127–29, Plaintiff revised its proposal, issuing a best and final lease offer on May 5, 2010.  V. Forte, Tr. at 133:19–134:5; G. Forte, Tr. at 253:22–254:5; *see also* JX 230 at 1347–48 (final lessor's annual cost statement); *id.* at 1132 (outlining final proposal revisions that GSA received from the two lease finalists).

---

[2] For ease of reference, joint exhibits are denoted as "JX," Plaintiff's exhibits are denoted as "PX," and the Government's exhibits are denoted as "DX."  Citations to exhibit page numbers generally refer to the bates-labeled page numbers in each exhibit, where available, with leading zeroes removed.  Any citations to exhibits without bates numbers refer to the exhibit's sequential page number.  Citations to the trial transcript refer to witness and page as "[Witness Name], Tr. at —."

In its proposal outlining cost items, Plaintiff included an estimate for real estate taxes. In the final proposal, under the section entitled "Estimated annual cost of ownership exclusive of capital charges," Plaintiff estimated yearly real estate taxes of $2,348,017, JX 230 at 1348, which equated to $3.50 of real estate tax per square foot, *see* Gmyr, Tr. at 1232:12–1233:2.[3] That number did not change from Plaintiff's initial proposal, which estimated "[c]urrent year taxes" of $2,348,017. JX 230 at 843. As Vincent Forte acknowledged at trial, real estate taxes for the Property were lower than that amount in 2010 when Plaintiff was preparing its proposal, meaning the amount did not reflect actual current year taxes. V. Forte, Tr. at 51:12–24.[4] Since the amount matches the estimate in the final proposal, it instead likely reflected an estimate of real estate taxes for the fully renovated buildings being offered. Notably, the initial proposal also indicated "yes" in response to the question of whether the inputted tax amounted was "[b]ased on fully assessed value." JX 230 at 843.

That representation mattered to GSA. In explaining part of its basis for deeming a competitor's final offer partially non-compliant, and thus weaker than Plaintiff's, GSA noted that the competitor had provided a tax estimate that was based on a partially assessed property value, not on the first year of full assessment. *See id.* at 1132; *see also id.* at 533 (competitor's lease proposal indicating "no" in response to fully-assessed-value question).

---

[3] An independent appraisal conducted in connection with Plaintiff's pre-proposal financing application also estimated close to $3.50 per square foot in real estate taxes assuming a fully renovated property. *See* Gmyr, Tr. at 1262:15–1264:4; C & L Group, LLC Appraisal at 48250, JX 130.

[4] Fairfax County records reflect that the total real estate taxes for the Property in 2010 were $273,478.71 (parcel A) + $348,458.50 (parcel B) + $84,927.24 (parcel C) for a total of $706,864.45. *See* 2010 Real Estate Tax Bill at 1007–09, JX 106.

Based on Plaintiff's final proposal, GSA awarded the Lease to Plaintiff, which the parties fully executed on July 12, 2010. *See id.* at 1134, 1258. The Lease has a 15-year term, with full occupancy to start no later than September 1, 2012, and an option for GSA to purchase the Property at the end of the lease term. *See id.* at 1121; *see also id.* at 1258–59 (Sections 2, 6(H)). It calls for total rentable office space of 668,285 square feet, renovated and improved as further provided in the Lease, for an annual rent of $24,953,761.90. *See id.* at 1258 (Sections 1, 3, 6(A)). A "Tenant Improvement Allowance" of $27,099,562.08, funded by GSA, for Plaintiff to use toward renovations was also provided. *See id.* (Section 6(B)). The Lease required substantial completion of building renovations in four phases, with the last phase ending by June 1, 2012. *See id.* at 1260.

The Lease also contains detailed provisions governing the parties' responsibilities concerning real estate taxes, including how the parties would address increases or decreases to real estate taxes assessed on the Property in the years following execution of the Lease. *See id.* at 1282–83 (Section 4.2). As relevant to this lawsuit, the Lease defines "Real Estate Taxes" to be

> those taxes that are levied upon the owners of real property by a Taxing Authority (as hereinafter defined) of a State or local Government on an ad valorem basis to raise general revenue for funding the provision of government services. The term excludes, without limitation, special assessments for specific purposes, assessments for business improvement districts, and/or community development assessments.

*Id.* at 1282 (Section 4.2.B.2). "Taxing Authority" means a "State, Commonwealth, Territory, County, City, Parish, or political subdivision thereof, authorized by law to levy, assess, and collect Real Estate Taxes." *Id.* (Section 4.2.B.3). The Lease defines "Unadjusted Real Estate Taxes" as "the full amount of Real Estate Taxes that would be assessed for the Property" in a tax year without factoring in any tax abatements. *Id.* (Section 4.2.B.6).

The Lease provides a tax adjustment mechanism for the parties to minimize the impact of increases or decreases above or below what would become, in effect, a default yearly tax amount.

Under that mechanism, GSA will "pay its share of any increases" and "receive its share of any decreases in the Real Estate Taxes for the Property" over the term of the Lease. *Id.* (Section 4.C.1).[5]  The key input for calculating the adjustment is the "Real Estate Tax Base," which the Lease defines to be

> the Unadjusted Real Estate Taxes for the first twelve (12) month period following the commencement of the Lease term.  If the Real Estate Taxes for that Year are not based upon a Full Assessment of the Property, then the Real Estate Tax Base shall be the Unadjusted Real Estate Taxes for the Property for the first full Tax Year for which the Real Estate Taxes are based upon a Full Assessment coincident with a full occupancy.  Such first full Tax Year may be hereinafter referred to as the "Tax Base Year."

*Id.* (Section 4.2.B.7).  Importantly, the Lease defines what it means for taxes to be based upon a "Full Assessment":

> The Property is deemed to be "Fully Assessed" (and Real Estate Taxes are deemed to be based on a "Full Assessment") only when a Taxing Authority has, for the purpose of determining the Lessor's liability for Real Estate Taxes, determined a value for the Property taking into account the value of all improvements contemplated for the Property pursuant to the Lease, and issued to the Lessor a tax bill or other notice of levy wherein the Real Estate Taxes for the full Tax Year are based upon such Full Assessment.  At no time prior to the issuance of such a bill or notice shall the Property be deemed Fully Assessed.

*Id.* (Section 4.2.B.8).  Because the Lease contemplated significant improvements to the Property, this clause—specifically, the portion establishing that the Property is fully assessed upon issuance of a tax bill from Fairfax County that is based on an assessment taking into account the "value of all improvements"—is central to the parties' current dispute.

---

[5] The Lease provides that GSA would pay "its share" calculated as a percentage of its occupancy of the Property.  JX 230 at 1282 (Section 4.2.C.1).  Because the Lease contemplated that the Government would fully occupy the Property upon completion of the renovations, *see id.* at 1259 (Section 6(E)), GSA was fully responsible under the Lease for reimbursing Plaintiff for tax increases.

### B.    Renovations to the Property

After the parties executed the Lease in July 2010, Plaintiff began minor construction at the site in November 2010.  *See* Construction Status Report at 75690, JX 132.  Full construction activities began in January 2011 following the departure of the previous tenant from the site.  *See id.*  By December 5, 2011, construction teams completed renovation work on the building exteriors on the Property—otherwise known as the "warm-lit shell" of each building.  V. Forte, Tr. at 66:24–67:7; *see* Northwest & Main Buildings Certificate of Substantial Completion at 33385, JX 163 (architect's certification of substantial completion); Southwest Building Certificate of Substantial Completion at 274148, JX 164 (same).

In the meantime, tenant improvements—generally, improvements to building interiors—began on or after June 2, 2011.  *See* June 2, 2011, Notice to Proceed at 111533, JX 133.  To cover additional costs for renovations, GSA approved Plaintiff's request for new funding above the Tenant Improvement Allowance and, per the Lease, established a payment schedule using "Reimbursable Work Authorizations" ("RWAs").  Morrison, Tr. at 1068:23–1069:5; June 15, 2011, Notice to Proceed at 43177, JX 138; JX 230 at 1419.  GSA approved the first progress payment toward renovations of tenant interiors (specifically, "preconstruction activities") in September 2011.  *See* Sept. 2, 2011, RWA at 2908170, JX 148.  Payments continued throughout the end of 2011 and most of 2012, concluding with the final renovation payment in early October 2012.  *See* Oct. 2, 2012, RWA at 2908239–40, JX 168; *see id.* at 2908241 ("As of the date of this inspection indicated above, the construction work is 100% complete with satisfaction.").  As indicated in the RWAs, GSA inspected the Property regularly during renovations.  *See, e.g.*, *id.* at 2908241; Mar. 1, 2012, RWA at 2908200, JX 153 (noting, based on an inspection conducted on February 8, 2012, that tenant interiors were roughly 93% complete, security requirements were

8

about 72% complete, construction to ancillary buildings was roughly 80% complete, and various other activities were in progress). As indicated in GSA's final payment authorization, renovations to the Property were fully complete by, at the absolute latest, October 1, 2012. *See* JX 168 at 2908241. The final certificate of substantial completion for the tenant improvements issued on October 5, 2012. *See* Pavilion Certificate of Substantial Completion at 31213, JX 167 (noting an effective date of September 18, 2012). In total, GSA reimbursed Plaintiff about $95 million for the costs of tenant improvements in addition to the Tenant Improvement Allowance of approximately $27 million. *See* Gmyr Expert Report at 99, 116, JX 229 (sum of total payments under TIA and RWAs); G. Forte, Tr. at 251:20–24.

Over the course of the Property's renovation, Plaintiff and its contractors applied to the County for an extensive set of work permits allowing them to conduct demolition and construction work at the Property. *See generally* List of Permits, JX 12; Permit Details, JX 13. The permits cover a variety of construction activities. For example, early permit applications, submitted in July 2010, sought permission to conduct interior demolition work in the various buildings of the Property. *See* JX 13 at 1. Other permits concerned plumbing work. *See, e.g.*, *id.* at 2. And still other permits allowed framing to proceed on building interiors. *See* Pellegrino, Tr. at 416:13–23; JX 12 at 1. Generally, Fairfax County tax assessors conducted periodic inspections of properties under construction and reviewed the status of work permits, marking permits as "complete" in County databases when the work associated with each permit had been completed. *See* Pellegrino, Tr. at 402:9–22 (noting that field inspections generally occur on an as-needed basis but that such inspections usually happen at least once in every four- to five-year period for every property in an assessor's portfolio), 417:12–23 (explaining the County's process for checking and completing work permits). The County marked a significant portion of work permits at the Property complete

by mid-2012.  *See* JX 12 at 1 (showing framing ("FRM") permits being marked complete on March 12, 2012).

One permit, however, did not get marked "complete" in the County's systems until significantly later than the rest.  *See* JX 13 at 39; Brincefield, Tr. at 730:16–731:6, 776:1–777:2.  That permit, which was issued on November 8, 2011, concerned a guard booth and canopy that Plaintiff constructed on the Property.  JX 13 at 39.  The permit remained open and incomplete in Fairfax County's system until a County supervisory assessor asked an assessor to conduct an inspection of the Property in December 2014.  *See* Brincefield, Tr. at 734:14–735:14.  At that point, the Fairfax County assessor—David Pellegrino—went to the Property for an inspection on December 19, 2014, and marked the permit 100% complete in the County's database.  JX 13 at 39; *see also* Pellegrino, Tr. at 465:1–14.  The remark for the permit indicates: "INSPECTION DATE BASED ON D. PELLEGRINO'S INSPECTION FOR 100% COMPLETION OF CONST." JX 13 at 39.

### C.    Fairfax County Tax Assessment Policies and Methods

The Fairfax County Department of Tax Administration issues yearly property-assessment notices to property owners located within the County.  *See, e.g.*, 2012 Assessment Notice, JX 30; 2013 Assessment Notice, JX 31; 2014 Assessment Notice, JX 32; 2015 Assessment Notice, JX 33; *see also* Pellegrino, Tr. at 453:20–454:3.  The assessed property value that appears on each assessment forms the basis for calculating the real estate taxes that Fairfax County bills to and collects from each property owner.  *See, e.g.*, 2012 Real Estate Tax Bill, JX 108; 2013 Real Estate Tax Bill, JX 109; 2014 Real Estate Tax Bill, JX 110; 2015 Real Estate Tax Bill, JX 111.

Fairfax County assessors have some discretion in how they perform tax assessments.  *See* Pellegrino, Tr. at 454:17–19.  The County's assessment process typically begins in late August of

a calendar year and continues through early December. *Id.* at 453:20–23. Tax assessments conducted during those months are for the following calendar year—*e.g.*, assessment activities, like site visits, that occurred in December 2014 would be factored into the 2015 tax year assessment. *Id.* at 454:1–6. As a general matter, calendar-year assessments aim to capture a property's value "as of" January 1 of the tax year. *Id.* at 455:3–5; *see also* 2012 Valuation History Report at 1443, JX 50 ("12RV: . . . BLDG EXTERIOR LOOKS COMPLETE; PARTS OF BUILDING STILL IN PROGRESS . . . 12RV: RENOVATIONS CONTINUE AS OF 1/1/12 . . . .").[6] Under certain circumstances, an assessor might gather information after the January 1 assessment date and factor that information into the current-year assessment if the assessment is still being finalized, which usually occurs in the beginning of the calendar year. *See* Pellegrino, Tr. at 410:18–24, 455:13–17. But even then, assessors still aim to capture a property's value as of January 1, meaning that any such information captured post-assessment date should be used to infer the status of a property as of January 1. *Id.* at 411:9–14 ("[I]f you have something of this magnitude with the subject property, and you go out there in early January and it's complete, you can be pretty safe in assuming that it was completed before December 31st. It's not like they just finished it in the last two days."), 412:13–17 ("[T]o be clear, . . . if the building was 90 percent complete, we would—we would want to give a market value that reflects that the building was 90 percent complete as of the first of the year.").

Mr. Pellegrino, currently an assistant director in charge of the Commercial Branch of the Real Estate Division of Fairfax County's Department of Tax Administration, *see id.* at 343:12–16,

---

[6] In the remarks section of Fairfax County's valuation history reports, a number followed by "RV" signals that a written remark was made during or associated with the review year indicated by the number, *e.g.*, "12RV" means the subsequent remark was made in relation to the 2012 review year. *See* Brincefield, Tr. at 774:24–775:5; Pellegrino, Tr. at 461:5–10.

and responsible for assessing the Property from 2009 to 2012, *see id.* at 344:19–345:5, testified about his typical process for conducting appraisals, *see id.* at 456:15–461:22.  Mr. Pellegrino testified that his yearly appraisal process typically began by reviewing a list of properties assigned to him.  *Id.* at 456:15–19.  He would then review which properties had been evaluated the year before, looking to see whether any significant changes had occurred, like physical changes to the property and changes in rents or in vacancies, that might justify changing certain inputs for his calculation of a property's assessed value.  *See id.* at 456:20–457:16.  He relied on several different sources of information in assessing properties.  *Id.* at 457:17–20.  One such source is called CoStar, which is a "private commercial real estate information system" that aggregates property information about commercial real estate.  *Id.* at 352:17–353:2; *see also* Brincefield, Tr. at 696:6–697:24.  Another source is surveys that property owners fill out and return to the County.  Pellegrino, Tr. at 457:17–20, 469:24–470:2.  These surveys typically include a property owner's representations about a property's vacancy, income, and expenses.  *See, e.g.*, 2015 Income & Expense Survey at 1228–31, JX 40; *see also* Aikin, Tr. at 518:5–14.

Mr. Pellegrino and two other witnesses at trial, Jonathan Aikin, an assessor with Fairfax County, *see* Aikin, Tr. at 510:23–511:8, and Catherine Brincefield, a now-retired supervisor (among other positions) in the Commercial Branch of the County's Real Estate Division, *see* Brincefield, Tr. at 687:22–689:13, testified about the County's real estate valuation methods in addition to their involvement with the Property's assessment.  Fairfax County assessors use several different methodologies for estimating the fair market value of commercial properties based on the information they gather.  *See* Pellegrino, Tr. at 468:19–469:1; Aikin, Tr. at 615:16–23; Brincefield, Tr. at 689:16–690:22.  Professional standards, Virginia law, and Fairfax County policy require County assessors to consider three approaches to valuing commercial property: (1) the cost

12

approach, roughly characterized as an estimate of the replacement cost of constructing a building on a piece of land; (2) the income approach, which estimates real-estate value based on the income a building generates; and (3) the sales comparison or market comparison approach, which estimates value based on sales of similar properties. Brincefield, Tr. at 689:18–690:4; *see also* 2012 Fairfax County Uniformity Guidelines at 737–41, JX 124. As described more fully below, the assessors used both the income and the cost approach to assess the various elements and parcels of the Property.

For buildings that produce income and for which assessors have a quality source of data on the amount of that income—*e.g.*, from survey responses and listing services—the most reliable method for assessing a building's fair-market value is the income approach. Pellegrino, Tr. at 469:2–7; Brincefield, Tr. at 690:5–691:3; JX 124 at 737 ("The income approach is the preferred methodology for an existing stabilized office building. The cost approach is typically used for partially complete structures. Sales of office buildings are used as benchmarks to test the valuation results derived by the other two approaches."), 739 ("If an office building is under construction as of January 1st of the year, the building will most likely be valued using the cost approach. . . . If the shell has been completed, the income approach should be used.").

The income approach to valuation relies on certain variables to help an assessor determine a market valuation. Those variables are: (1) a property's estimated economic rent per square foot, (2) a property's total square footage, (3) the market vacancy percentage, (4) a property's expenses per square foot, (5) a property's capitalization rate, and (6) the tax rate that applies. *See* Pellegrino, Tr. at 355:13–356:1. Economic rent, square footage, and market vacancy lead to an estimate for a property's effective gross income. *See id.* at 355:18–21. Assessors then subtract expenses to estimate net operating income. *See id.* at 355:21–22. They then divide net operating income by a

sum of the capitalization rate and the applicable tax rate to estimate the property's fair market value. *See id.* at 355:23–25. The formula is as follows:

$$\frac{(economic\ rent\ psf \times square\ footage) - market\ vacancy - operating\ expenses}{(capitalization\ rate + tax\ rate)}$$

*Id.* at 355:18–356:1; *see also* Brincefield, Tr. at 698:24–699:6 (noting that the equation should also include any miscellaneous income in the numerator); JX 124 at 740.

The significant increase in the Property's assessed value in 2015 resulted from the County's use of two key variables in its income-approach valuation: (1) the economic rent and (2) the capitalization rate that the County assigned to the Property. In Fairfax County, assessors estimate a building's economic rent by relying on several different sources. To an assessor, economic rent fulfills a function similar to what might be reflected in a "market rent"—*i.e.*, an estimate as to the rent that similar properties in the subject property's market might be able to achieve. Pellegrino, Tr. at 346:4–16. In essence, assessors consider "what the typical participant in the market would pay" to rent a given commercial building as part of their process for estimating economic rent. *Id.* at 346:9–16; *see* Aikin, Tr. at 627:11–14; Brincefield, Tr. at 699:10–700:23. Importantly, though, Fairfax County assessors must consider a property's actual rent in formulating their estimate for a property's economic rent. *See* Brincefield, Tr. at 699:23–700:10; *see also* JX 124 at 740 ("[T]he bulk of . . . office income, expense, and vacancy data is derived from returned Income and Expense Surveys . . . . The information returned on the office building surveys is analyzed by the appraiser in order to assist in the determination of economic rents, operating expenses, and how or if expenses change . . . ."). Assessors have a degree of discretion in balancing different data sources to come up with an estimate for economic rent; for example, some assessors might put more weight than others on actual rent. *See* Brincefield, Tr. at 700:11–23. But assessors should always consider

14

a property's actual rent in their assessment, in part because long-term commercial leases—depending on when they were signed—might either lag behind or serve as a bellwether for market trends. *Id.* at 699:23–700:10.

The capitalization rate that the County assigns to properties represents the rate of return that might be expected from an investment in a given piece of real estate. *See* V. Forte, Tr. at 98:4–5; Lennhoff, Tr. at 1381:2–15. The lower a capitalization rate, the less risky it is to invest in a property, meaning that the property's present value is likely to be higher. *See* V. Forte, Tr. at 98:5–8. Fairfax County, somewhat unusually, ties its estimate of a property's capitalization rate directly to that property's "effective age." Lennhoff, Tr. at 1438:16–1439:11; *see also* JX 124 at 745 (showing "2012 Office Capitalization Rate Array" establishing capitalization rates based solely on an assessor's estimate of a building's effective age); Pellegrino, Tr. at 471:11–23 (discussing the County's 2015 capitalization-rate table).

An assessor's estimate of a building's effective age aims to capture the general condition of the building, expressed as an estimated "age" in years. Brincefield, Tr. at 772:12–17; *see* JX 124 at 743. In Fairfax County, "[e]ffective age is the age of a property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different than its chronological age." JX 124 at 743. "A property's effective age is affected by building system upgrades, large tenant improvements, and/or renovations of common areas." *Id.* Usually, when a building is initially constructed, assessors set the building's effective age exactly at the building's chronological age. *See* Brincefield, Tr. at 770:12–17. Then, with each year that passes, the building's effective age—just like its chronological age—typically increases by one. *See id.* at 767:17–768:24; *see also* Lennhoff, Tr. at 1392:25–1393:5. Only when a building undergoes system upgrades, improvements, or renovations might an assessor consider setting the building's

effective age at a different level—usually lower, to reflect those improvements—than its chronological age. *See* Brincefield, Tr. at 770:12–771:1; JX 124 at 743.

Per County policy, "the determination of effective age is based on the appraiser's judgment." JX 124 at 743. But "[a]ppraisers should always document the reason for making a property's effective age different than its chronological age." *Id.* Such reasons typically include "physical inspection, property owner/management interviews, or the completion of new construction and/or renovations." *Id.* Guidelines recommend (1) decreases of five to 10 years for standard tenant quality improvements; (2) decreases of five to 10 years for common-area renovations or improvements to exterior facades; and (3) decreases of zero to 50 years for significant renovations like heating and ventilation system improvements, upgraded air conditioning, upgraded fire suppression systems, roofing improvements, exterior wall replacements, window repair and replacements, security system upgrades, lighting fixture upgrades, and wiring upgrades. *Id.* Property improvements lead to a lower effective age because those improvements have the effect of making the property more like new—*i.e.*, decreasing the "amount of observed deterioration and obsolescence" that the building has sustained. *Id.*

Once a Fairfax County assessor sets a building's effective age, he then uses the County's capitalization rate array to determine the capitalization rate to use in the income-approach calculation of a property's fair-market value. *See id.* at 745. As a building's age increases, its capitalization rate also increases, and its value (all other variables held equal) goes down. *See id.*; *see also* V. Forte, Tr. at 98:4–8. If an assessor decreases a building's effective age—in essence making the building functionally "newer" for purposes of the tax assessment—then the associated capitalization rate also decreases. *See* JX 124 at 745; Lennhoff, Tr. at 1393:20–1394:8; Lipman, Tr. at 971:17–25. That change, which occurs in the denominator of the income-approach formula,

16

causes the building's fair-market value under the income approach calculation (again, all other variables held equal) to increase. *See* Lennhoff, Tr. at 1394:5–16; V. Forte, Tr. at 98:4–8.

### D.    Fairfax County Assessment of the Property

For the purposes of this lawsuit, the Property's relevant assessment history begins in 2007. The Property is composed of three land parcels and four "elements," three of which, per Fairfax County's designations, are elevator offices and one of which is excess land. *See, e.g.*, 2007 Valuation History Report at 1314–15, JX 45. Elements one and three, both of which are elevator offices, sit on land parcel A. *See id.* at 1314 (noting in 2007 that element one was called the "E SYSTEMS EAST WING" and element three was called the "E SYSTEMS WEST WING"). Element two is undeveloped or excess land; it comprises the entirety of land parcel C. *See id.* Element five is another elevator office building that sits on land parcel B. *See id.* at 1315 (noting in 2007 that element five was called the "E SYSTEMS NW WING").[7] The County values each element separately. Elements one, three, and five (the elevator office buildings) are valued using the income approach. *See id.* at 1314–15. The County uses the income approach for those elements because they are fully constructed commercial office buildings that generate income

---

[7] For ease of reference, the Court adopts element numbers that reflect the County's internal designations. For instance, "element one" refers to element number "E01242001," "element two" refers to element number "E01242002," "element three" refers to element number "E01242003," and "element five" refers to element number "E01242005." JX 45 at 1314–15. Although the County's nomenclature might suggest there are five elements associated with the Property, there are in fact only four. *See id.* at 1314. The Valuation History Reports refer to the buildings on the property parcels as the east, west, and northwest wings, respectively. *See, e.g.*, *id.* at 1314–15. Trial testimony and other exhibits sometimes refer to the "Main," "Southwest," and "Northwest" buildings on the Property. *See, e.g.*, V. Forte, Tr. at 166:15–167:3; JX 133 at 111534. The Main Building is element one (the east wing), the oldest and largest building. *See* JX 45 at 1314, 1316. The Southwest Building is element three (the west wing), the smaller and slightly younger annex to the building on element one. *See id.* at 1314, 1324. Element five is the Northwest Building, also referred to as the northwest wing. *See id.* at 1315.

through rent.  *See* JX 124 at 737 (explaining that the income approach is the "preferred methodology for an existing stabilized office building"), 739 (noting that if a building under construction has passed the stage where its "shell" is complete, "the income approach should be used"); Brincefield, Tr. at 690:5–7.  Element two—which is just land—is assessed using the cost approach.  *See* JX 45 at 1314.  The County's valuation of element two includes a combination of estimated land value and a replacement cost estimate for minor improvements to the land, like asphalt paving and light poles.  *See id.* at 1321.

For each element, the County sums the value of the land the element sits on and the value of the improvements to the land.  *See id.* at 1314–15.  The County calculates the value for the entire "appraisal unit"—*i.e.*, the Property—by summing the value of all four elements, which is the same as the summed value of the three land parcels.  *See id.* at 1314 (capitalization removed).  The County sends tax bills broken out by land parcel with each parcel's tax liability based on the assessed value of the parcel.  *Compare, e.g.*, 2009 Valuation History Report at 1358, JX 47 (noting parcel A value of $28,597,520, parcel B value of $45,131,810, and parcel C value of $11,264,640), *with* 2009 Real Estate Tax Bill at 1261–63, JX 105 (noting parcel A "JANUARY 1 VALUE" of $28,597,520, parcel B "JANUARY 1 VALUE" of $45,131,810, and parcel C "JANUARY 1 VALUE" of $11,264,640).

    1.    <u>2007 Assessment</u>

In 2007, the County assessed the Property at a total value of $91,973,390.[8]  JX 45 at 1314. Parcel A was worth $31,780,700 with elements one and three, the east and west wings that are the

---

    [8] The earliest year for which the parties provided documentation of the Property's assessment history is 2007.

constituent elements of parcel A, valued at $18,857,420 and $12,923,280 respectively. *Id.* Element five, the northwest wing that is the constituent element of parcel B, was assessed at $51,244,150. *Id.* Element two, the excess land that is the constituent element of parcel C, was valued at $8,948,540. *Id.* The County's records indicate that the east wing was built in 1954 and, at the time the property was assessed in late 2006, had an effective age of 52 years; thus, the element's chronological age was the same as its effective age. *Id.* at 1316. The west wing was built in 1960. In late 2006, the County assigned it an effective age of 41 years, five years less than its actual chronological age. *Id.* at 1324. The northwest wing, per the County, was built in 1984. *Id.* at 1328. The County assigned it an effective age of 22 years, which, in late 2006, was the same as the building's chronological age. *See id.* The excess land on the Property (element two) did not receive an effective age because the parcel contains no buildings. *See id.* at 1321.

In the portion of its records describing available tenant data, the County estimated the economic rent for the vast majority of element one, the east wing, at $15 per square foot. *Id.* at 1320. The County recorded actual rent of $2.80 per square foot, presumably from income surveys that Plaintiff completed and returned, but that data most likely reflects rent from a lease that expired in 1990.[9] *See id.* The County estimated the economic rent for element three, the west wing, at $16 per square foot. *Id.* at 1327. And the County estimated economic rent for element five, the northwest wing, at $24 per square foot. *Id.* at 1331. The County's records include no remarks for the 2007 review year. *See id.* at 1333–35.

---

[9] The data reflected in this Valuation History Report, and the reports for the next two review years, is based on Plaintiff's lease with Raytheon, the tenant before the Government. Raytheon occupied the Property from 1974 through 2010 and vacated the Property by January 1, 2011. *See* JX 132 at 75690; V. Forte, Tr. at 43:3–4, 165:12–25.

### 2.    2008 Assessment

In 2008, the County assessed the Property at a total value of $94,660,030, *see* 2008 Valuation History Report at 1336, JX 46, roughly 2.9% higher than the value in 2007.  Parcel A was worth $32,486,580 with the east and west wings valued at $19,332,610 and $13,153,970 respectively.  *Id.*  The northwest wing—parcel B—was assessed at $50,909,480.  *Id.* at 1336–37. The excess land—parcel C—was valued at $11,263,970.  *Id.* at 1336.  Each wing's effective age increased by one year, remaining equivalent or close to each building's actual chronological age. *See id.* at 1338 (east wing increased to 53 years), 1346 (west wing increased to 42 years), 1350 (northwest wing increased to 23 years).

The County estimated the economic rent for most of the east wing at $15.50 per square foot, a small increase from the prior year.  *See id.* at 1342.  Based on updated actual rent data for a lease beginning January 1, 2006, and ending December 31, 2010, the County's records reflect that the east wing was generating $22.42 per square foot in rent.  *Id.*  The County estimated economic rent for the west wing to be $16.25 per square foot, a similarly small increase from the prior year.  *See id.* at 1359.  And the County's estimate for economic rent for the northwest wing remained the same at $24 per square foot.  *See id.* at 1353.  Like the year before, the County's records appear to include no relevant remarks for the 2008 review year.  *See id.* at 1355–57.

### 3.    2009 Assessment

In 2009, Mr. Pellegrino became the primary assessor for the Property.  Pellegrino, Tr. at 344:21–22.  He assessed the Property at a total value of $84,993,970, *see* JX 47 at 1358, a 10.2% drop from the year before and roughly 7.6% lower than the value in 2007.  Parcel A was worth $28,597,520 with the east and west wings valued at $16,946,040 and $11,651,480 respectively. *Id.* at 1358.  The northwest wing—parcel B—was assessed at $45,131,810.  *Id.* at 1358–59.  The

excess land constituting parcel C was valued at $11,264,640.  *Id.* at 1358.  As with the prior year, each wing's effective age increased by one year, remaining equivalent or close to each building's actual chronological age.  *See id.* at 1360 (east wing increased to 54 years), 1368 (west wing increased to 43 years), 1372 (northwest wing increased to 24 years).

The County's estimated economic rent for most of the east wing was $15.50 per square foot, unchanged from the previous year.  *See id.* at 1364.  The County's actual rent data changed slightly to reflect actual rent of $24.44 per square foot for the east wing.  *See id.*  The County's estimated economic rent for the west and east wings—$16.25 and $24 per square foot respectively—went unchanged from the previous year.  *See id.* at 1371, 1375.  Again, the County's records appear to include no relevant remarks for the 2009 review year.  *See id.* at 1377–79.

In early 2009, the County issued a tax bill based on the "JANUARY 1 VALUE" of these land parcel assessments.[10]  *See* JX 105.  The County taxed parcel A in the amount of $297,414.21 in real estate taxes for the year, *see id.* at 1264; parcel B in the amount of $469,370.82, *see id.* at 1265; and parcel C in the amount of $117,152.26, *see id.* at 1266.  Those values sum to a total 2009 real estate tax bill for the Property of $883,937.29.

### 4.    2010 Assessment

In 2010, Mr. Pellegrino assessed the Property at a total value of $64,849,950, *see* 2010 Valuation History Report at 1380, JX 48, a 23.7% drop from the year before and roughly 29.5% lower than the value in 2007.  Parcel A was worth $25,089,790 with the east and west wings valued at $14,904,110 and $10,185,680 respectively.  *Id.* at 1380.  The northwest wing—parcel B—was assessed at $31,968,670.  *Id.* at 1380–81.  The excess land—parcel C—was valued at $7,791,490.

---

[10] The earliest year for which the parties provided copies of the Property's tax bills is 2009.

*Id.* at 1380.  Continuing the trend of the prior years, each wing's effective age increased by one year, remaining tied or close to each building's actual chronological age.  *See id.* at 1382 (east wing increased to 55 years), 1390 (west wing increased to 44 years), 1394 (northwest wing increased to 25 years).

The County's estimated economic rent for most of the east wing was $15.50 per square foot, unchanged from the 2009 valuation history report.  *See id.* at 1386; *see also* JX 47 at 1364. The County's actual rent data changed back to $22.42 per square foot, *see* JX 48 at 1386, the same value included in the 2008 valuation history report, *see* JX 46 at 1342.  The County's estimated economic rent for the west wing was $16.25 per square foot—unchanged from the previous two years.  *See* JX 48 at 1393.  The County's estimated economic rent for the northwest wing decreased by two dollars to $22 per square foot.  *See id.* at 1397.

The County's records reflect some remarks by Mr. Pellegrino associated with events in 2010, though no remark clearly indicates that the event was considered for the 2010 review year. For example, under the remarks for element five, the northwest wing, the records state: "2010 & 2011 – EXTENSIVE RENOVATIONS TO BUILDINGS UNDERWAY."  *Id.* at 1400.  Under notes related to parcel A, the notes reflect descriptions of certain work permits related to renovations in 2010 and 2011: "2010 & 2011 MULTIPLE INT WORK PMTS; SEE PMTS FOR EST COSTS – MOST $240-$310K; ALSO EXTERIOR WORK IN PROGRESS; MAJOR BUILDING RENOVATION UNDERWAY."  *Id.*  Given that major construction activities did not start at the Property until the beginning of 2011, *see* JX 132 at 75690, Mr. Pellegrino almost

certainly did not add these remarks to the Property's valuation history in the County's database until sometime during the 2011 calendar year at the earliest.[11]

In early 2010, the County issued a tax bill based on the value of the above land parcel assessments. *See* 2010 Real Estate Tax Bill, JX 106. The County taxed parcel A in the amount of $273,478.71 in real estate taxes for the year, *see id.* at 1007; parcel B in the amount of $348,458.50, *see id.* at 1008; and parcel C in the amount of $84,927.24, *see id.* at 1009. Those values sum to a total 2010 real estate tax bill for the Property of $706,864.45.

### 5.    2011 Assessment

In 2011, Mr. Pellegrino assessed the Property at a total value of $82,961,230, *see* 2011 Valuation History Report at 1402, JX 49, a 27.9% increase from the year before but still about 9.8% lower than the Property's value in 2007. Parcel A was worth $35,470,890 with the east and west wings valued at $19,946,430 and $15,524,460 respectively. *Id.* at 1402. The northwest wing—parcel B—was assessed at $39,698,850. *Id.* at 1402–03. The excess land constituting parcel C was valued at $7,791,490, the same as the year prior. *See id.* at 1402. As before, each wing's effective age increased by one year, remaining equal or close to each building's actual chronological age. *See id.* at 1404 (east wing increased to 56 years), 1412 (west wing increased to 45 years), 1416 (northwest wing increased to 26 years).

The County's estimated economic rent for most of the east wing was $18 per square foot, a slight increase over the prior year's economic rent of $15.50. *See id.* at 1408; JX 48 at 1386.

---

[11] Remarks associated with the Property appear across the Property's entire valuation history, meaning that any given year's valuation history report includes all remarks for the Property related to all review years (both past and future). *Compare, e.g.*, JX 45 at 1333–35 (2007 history report containing full history of remarks), *with* 2015 Valuation History Report at 1509–11, JX 53 (containing same remarks).

The County's estimated economic rent for the west wing was $20.50, an increase of more than four dollars from the year prior.  *See* JX 49 at 1415.  The County's estimated economic rent for the northwest wing increased by three dollars to $25 per square foot.  *See id.* at 1419.  Notably, this report includes, for the first time, actual rent data from the lease that the Government signed with Plaintiff.  *See id.* at 1408.  The report notes that each wing generated actual rent of $38.50 per square foot.  *See id.* at 1408, 1415, 1419.[12]

In addition to the remarks described above that have limited references to the year 2010, the County's records include more remarks by Mr. Pellegrino explicitly associated with the 2011 review year.  A remark for the entire Property states: "11RV: PER WASH BIZ JRNL: DOD SIGNED BIG LEASE@ 7700 ARLINGTON BLVD. TERMS UNKNWN."  *Id.* at 1421.  The remarks continued, describing the previous tenant's move to another site: "11RV: SINGLE TNT RAYTHEON CONSOLIDATING, MOVING TO FMR AOL CAMPUS; LEASE EXP 12/10; INDUSTRY NEWS – BIG LEASE SIGNED W DEFENSE DEPT MEDICAL COMMAND HQ ALONG WITH NAVY BUREAU OF MEDICINE, OFFICE OF SEC OF DEFENSE, AND OFFICE OF SURGEON GEN OF AIR FORCE."  *Id.*  The remarks further described the reported lease terms and the various construction permits that Plaintiff had sought: "EXPECTED TO MOVE IN 2011; SUPPOSEDLY BETWEEN 644,000 & 688,000SF, 15 YR; LEASE VALUED AT $371.9M; . . . MULTIPLE 2010 PMTS FOR INT ALTS, ELEC, PLUMB, MECH."  *Id.* (outlining reported square footage; lease valuation; and permits for interior alterations and electric, plumbing, and mechanical renovations).  A remark for element one, the east wing, indicates: "11RV: EXTENSIVE BUILDING RENOVATIONS UNDERWAY."  *Id.*  Similarly, a remark for

---

[12] As noted above, this actual-rent data would likely have come from an Income and Expense Survey that Plaintiff filled out and returned to the County.  Pellegrino, Tr. at 457:17–24.

24

the west wing notes that: "11RV: MAJOR RENOVATIONS TO BUILDING UNDERWAY BOTH INT & EXT." *Id.* Mr. Pellegrino testified at trial that he likely based this remark on observations he made during a site visit to the Property prior to issuing the notice of assessment for the 2011 review year. *See* Pellegrino, Tr. at 391:20–392:22.

In early 2011, the County issued a tax bill based on the value of the above land parcel assessments. *See* 2011 Real Estate Tax Bill, JX 107. The County taxed parcel A in the amount of $379,538.52 in real estate taxes for the year, *see id.* at 1061; parcel B in the amount of $424,777.70, *see id.* at 1062; and parcel C in the amount of $83,368.94, *see id.* at 1063. Those values sum to a total 2011 real estate tax bill for the Property of $887,685.16.

The County also issued a "Notice of Real Estate Assessment Change" for each land parcel in 2011.[13] *See* 2011 Notice of Assessment at 1860–62, JX 29 (capitalization removed). The notice showed the value of each parcel assessed in 2010 as compared to the updated assessment for 2011. *See generally id.* Each parcel provides a "Reason(s) for Change" in the assessment. *See id.* at 1860–62 (capitalization removed). Mr. Pellegrino identified the reason for the change to each parcel's assessment as "REASSESSMENT." *Id.* According to the assessors who testified, a change due to reassessment means that, upon review, a property's value has changed based on general market-wide trends for similar properties. *See* Pellegrino, Tr. at 472:24–473:12; Brincefield, Tr. at 758:4–7.

### 6. 2012 Assessment

In 2012, Mr. Pellegrino assessed the Property at a total value of $99,584,810, *see* JX 50 at 1424, a 20.0% increase from the year before and about 8.2% higher than the Property's value in

---

[13] The earliest year for which the parties provided copies of the Property's notices of real estate assessment change is 2011.

2007.  Parcel A was worth $53,113,520 with the east and west wings valued at $32,794,280 and $20,319,240 respectively.  *Id.* at 1424.  The northwest wing—parcel B—was assessed at $38,679,800. *Id.* at 1424–25.  The excess land constituting parcel C was valued at $7,791,490, the same as in the previous two years. *See id.* at 1424.  As before, each wing's effective age increased by one year in step with each building's actual chronological age. *See id.* at 1426 (east wing increased to 57 years), 1434 (west wing increased to 46 years), 1438 (northwest wing increased to 27 years).

The County's estimated economic rent for most of the east wing was $23 per square foot, a five-dollar increase over the economic rent in 2011. *See id.* at 1430.  The County's estimated economic rent for the west wing was $23 per square foot, almost three dollars higher than in 2011. *See id.* at 1437.  The County's estimated economic rent for the northwest wing decreased by two dollars to $23 per square foot. *See id.* at 1441.  The actual rent generated by each wing remained unchanged at $38.50 per square foot. *See id.* at 1430, 1437, 1441.

The County's records include several remarks by Mr. Pellegrino for the 2012 review year, demonstrating that he stayed abreast of the construction that was occurring at the Property since the 2011 assessment. *See* Pellegrino, Tr. at 403:2–406:7.  The first remark describes work permits and references a site visit that Mr. Pellegrino performed in January 2012 showing work at the Property was still in progress: "12RV: MULTIPLE INT WORK, E, P, M PMTS; SEE PMT TAB; SITE CHECK 1/12 – BLDG EXTERIOR WORK LOOKS COMPLETE; PARTS OF BLDG STILL IN PROGRESS; 0112/45."  JX 50 at 1443; *see also* Pellegrino, Tr. at 404:1–5 (testifying that the last number at the end of the remark ("0112/45") indicates the date and his appraiser number, meaning he authored the remark).  Mr. Pellegrino added a similar comment for element one: "12RV: RENOVATIONS CONTINUE AS OF 1/1/12: #45."  JX 50 at 1443.  Element three

includes the comment: "12RV: RENOVATIONS CONTINUE." *Id.* at 1444. Although not noted in the 2012 Valuation History Report, Mr. Pellegrino also conducted a site visit to the Property in March 2011 and photographed the status of construction as of that date. *See* Pellegrino, Tr. at 400:17–402:3; *see also, e.g.*, iasWorld Photo Report, JX 19.

In early 2012, the County issued a tax bill based on the above land parcel assessments. *See* JX 108. The County taxed parcel A in the amount of $570,970.34 in real estate taxes for the year, *see id.* at 1067; parcel B in the amount of $415,807.85, *see id.* at 1068; and parcel C in the amount of $83,758.52, *see id.* at 1069. Those values sum to a total 2012 real estate tax bill of $1,070,536.71.

The notice of real estate assessment change that the County issued in 2012 reflected the updated assessed value for each land parcel. *See* JX 30 at 1863–65. Mr. Pellegrino provided the following reasons for each parcel's assessment change: "REASSESSMENT" and "CONSTRUCTION PARTIALLY COMPLETED." *Id.*

In May 2012, after the 2012 assessment was complete, Mr. Pellegrino left County employment and moved to North Carolina. *See* Pellegrino, Tr. at 371:9–13, 453:5–10. As discussed further below, he returned to his position as a Fairfax County tax assessor in June 2014. *See id.* at 453:11–12.

### 7.    2013 Assessment

Responsibility for assessing the Property in the 2013 review year changed. After Mr. Pellegrino's departure, Jonathan Aikin became the Property's assessor. Aikin, Tr. at 512:1–12; Pellegrino, Tr. at 425:4–13. Catherine Brincefield became the supervisory assessor responsible for reviewing the Property's assessment. Brincefield, Tr. at 689:12–15. In 2013, the first review year for which the County could have possibly included the value of all renovations to the Property,

the County assessed the Property at a total value of $100,666,270, *see* 2013 Valuation History Report at 1446, JX 51, a 1.1% increase from the year before and about 9.5% higher than the Property's value in 2007.  Parcel A was worth $53,765,810 with the east and west wings valued at $33,330,520 and $20,435,290 respectively.  *Id.* at 1446.  The northwest wing on parcel B was assessed at $39,108,970.  *Id.* at 1446–47.  For the fourth year in a row, the excess land constituting parcel C was valued at $7,791,490.  *See id.* at 1446.

Notably, despite the fact that the Property's major renovation was complete as of October 1, 2012, the effective age of each wing continued to increase by one year in line with or close to each building's actual chronological age.  *See id.* at 1448 (east wing increased to 58 years), 1456 (west wing increased to 47 years), 1460 (northwest wing increased to 28 years).  Based on the County's guidance, one would expect to see a significant decrease in effective age following such significant renovations.  *See* JX 124 at 743 (recommending 0- to 50-year decrease for "building system" or "long lived item renovations," "depending on the scope and quality of the renovations" (capitalization removed)).

The County's estimated economic rent and actual rent figures likewise remained unchanged.  *See* JX 51 at 1452 (most of east wing economic rent $23 per square foot, actual rent $38.50), 1459 (west wing economic rent $23 per square foot, actual rent $38.50), 1463 (northwest wing economic rent $23 per square foot, actual rent $38.50).  And the County's records include no written remarks associated with the 2013 review year.  *See id.* at 1465–67.

In early 2013, the County issued a tax bill based on the above land parcel assessments.  *See* JX 109.  The County taxed parcel A in the amount of $583,359.04 in real estate taxes for the year, *see id.* at 1013; parcel B in the amount of $424,332.32, *see id.* at 1014; and parcel C in the amount

of $84,537.67, *see id.* at 1015.   Those values sum to a total 2013 real estate tax bill of $1,092,229.03.

The County's notice of real estate assessment change, like in the years prior, reflected the Property's updated assessed value for 2013 as compared to its value in 2012.   *See* JX 31 at 998–1000.   Under the reasons listed for each parcel's change, Mr. Aikin included only "REASSESSMENT," *id.*, meaning, as in earlier years, that the Property's value had changed as a result of general market trends.   *See* Aikin, Tr. at 617:11–16; Pellegrino, Tr. at 472:24–473:12; Brincefield, Tr. at 758:4–7.

8.   2014 Assessment

In 2014, Mr. Aikin assessed the Property at a total value of $96,993,280, *see* 2014 Valuation History Report at 1468, JX 52, a 3.6% decrease from the year before and about 5.5% higher than the Property's value in 2007.   Parcel A was worth $50,526,100 with the east and west wings valued at $30,418,370 and $20,107,730 respectively.   *Id.* at 1468.   The northwest wing— parcel B—was assessed at $38,675,690.   *Id.* at 1468–69.   For the fifth year in a row, the excess land on parcel C was valued at $7,791,490.   *See id.* at 1468.

Again, the effective age of each wing increased by one year, remaining tied or close to each building's actual chronological age.   *See id.* at 1470 (east wing increased to 59 years), 1478 (west wing increased to 48 years), 1482 (northwest wing increased to 29 years).

The County's estimated economic rent for each wing increased by 50 cents from the 2013 estimate.   *See id.* at 1474 (most of east wing economic rent $23.50 per square foot), 1481 (west wing economic rent $23.50 per square foot), 1485 (northwest wing economic rent $23.50 per square foot).   The actual rent for all wings remained unchanged at $38.50.   *See id.*

The County's records include no remarks clearly associated with the 2014 review year. *See id.* at 1487–89. While two remarks reference 2014, one remark simply describes that Plaintiff changed its corporate name in 2014. *See id.* at 1488–89. The other remark indicates that Mr. Pellegrino toured the facility with a GBA representative on December 19, 2014, *see id.* at 1487 ("TOURED FACILITY ON 12/19/14 . . . ."), but—as described below—that remark relates to the 2015 review year.

In early 2014, the County issued a tax bill based on the above land parcel assessments. *See* JX 110. The County taxed parcel A in the amount of $550,734.49 in real estate taxes for the year, *see id.* at 1019; parcel B in the amount of $421,565.02, *see id.* at 1020; and parcel C in the amount of $84,927.24, *see id.* at 1021. Those values sum to a total 2014 real estate tax bill of $1,057,226.75.

The 2014 notice of real estate assessment change further laid out the values the County had assessed for each land parcel. *See* JX 32 at 989–91. Like the year before, Mr. Aikin identified the reason for each parcel's change as: "REASSESSMENT." *Id.* That indicates that the change in value resulted from changes in general market trends. *See* Aikin, Tr. at 632:13–22; Pellegrino, Tr. at 472:24–473:12; Brincefield, Tr. at 758:4–7.

9.    2015 Assessment

Responsibility for assessing the Property changed again in the 2015 review year. Although Mr. Aikin testified, albeit hesitantly, that he was responsible for assessing the Property in 2015, Ms. Brincefield testified that she assumed primary responsibility for assessing the Property while Mr. Aikin was on leave. *Compare* Aikin, Tr. at 512:1–12 (noting that he did not "know for sure" about assessing the Property in 2015 but had no reason to doubt his prior deposition testimony), 547:6–9 ("Q: Do you believe that you assessed this property in the 2013 to 2014 -- 2015 time

30

frame? A. If that's what the records have. I don't specifically remember what year it was."), *with* Brincefield, Tr. at 730:23–731:1, 745:19–746:19 (testifying that she recalled taking over the assessment for the 2015 review year because Mr. Aikin was on leave in late 2014). Having observed the testimony, the Court finds Ms. Brincefield's recollection of events to be more credible and the involvement of a new assessor in the 2015 review year to be more consistent with the facts as a whole. Thus, the Court concludes that Ms. Brincefield was responsible for finalizing the Property's assessment in 2015.

With Ms. Brincefield as the assessor, the Property's total value nearly doubled from the year prior. In 2015, the total assessed value of the Property was $182,870,960, *see* 2015 Valuation History Report at 1490, JX 53, an 88.5% increase from the year before and 98.8% higher than the Property's value in 2007. Parcel A was worth $108,649,860 with the east and west wings valued at $69,767,710 and $38,882,150 respectively. *Id.* The northwest wing on parcel B was assessed at $66,429,610. *Id.* at 1490–91. And for the sixth year straight the excess land value (parcel C) stayed the same at $7,791,490. *See id.* at 1490.

Importantly, each building's effective age decreased significantly. The east wing's effective age decreased from 59 years to 24 years, a 36-year drop (assuming one additional chronological year). *See* JX 53 at 1492. As a result, the east wing's effective year built changed from 1954—the actual year built—to 1990. *See id.* Similarly, the west wing's effective age decreased from 48 years to 24 years, a 25-year drop. *See id.* at 1500. This changed the west wing's effective year built to 1990, replacing the prior year's effective year built of 1965. *See id.* The northwest wing's effective age decreased from 29 years to 14 years, a 16-year drop. *See id.* at 1504. The County changed the northwest wing's effective year built from 1984—its actual construction date—to 2000. *See id.*

Economic rent also changed more significantly in the 2015 assessment than it did in any year in evidence in this lawsuit. In 2015, the County's estimated economic rent for the east wing was $35 per square foot, up $11.50 from the year prior. *See id.* at 1496. The County's actual rent data changed slightly: per the records, the vast majority of the east wing had an actual rent of $36.53. *See id.* Similarly, the County's estimated economic rent for the west wing was $35 per square foot, $11.50 higher than the year prior. *See id.* at 1503. Actual rent likewise changed slightly to $36.91 per square foot. *See id.* Finally, data for the northwest wing followed the same pattern: economic rent increased by $11.50 to $35 per square foot, and actual rent changed slightly to $36.91 per square foot. *See id.* at 1507.

The County's remarks include several important comments related to the 2015 review year. The first remark indicates that Mr. Pellegrino—who returned to County employment in June 2014—inspected the Property on December 19, 2014. *See* JX 53 at 1509. He did so at the request of Ms. Brincefield, who testified that she discovered an outstanding construction permit for the Property related to security guard booths that was never marked complete. *See* Brincefield, Tr. at 730:21–731:7; *see also id.* at 746:4–747:4 (explaining that she would not have asked Mr. Pellegrino to visit the Property if Mr. Aikin had been "around"). Mr. Pellegrino's inspection, however, went beyond assessing the completion of an outstanding County permit. Contemporaneous communications between Mr. Pellegrino and Plaintiff's representatives confirm that Mr. Pellegrino sought to tour the Property in December 2014 to "make sure our information is up to date" and to "get a sense for the interior finishes of the buildings since they were renovated." Email re: 7700 Arlington Boulevard, Falls Church at 85481, JX 203; *see also* Pellegrino, Tr. at 431:25–432:12 (testifying that he "was asked in December of 2014 to touch base

with . . . ownership or somebody who managed the building [to] . . . get an interior tour of the building"), 433:23–434:2.

As a result of Mr. Pellegrino's tour, the County closed out the final permit and documented for the first time that all construction on the Property was 100% complete. *See* JX 13 at 39; JX 53 at 1509. A description of the renovation appears in a remark under element one. There, immediately below the "12RV" remark from Mr. Pellegrino indicating that renovations continued at the Property as of January 1, 2012, appears:

> 15RV:MAJOR GUT RENOVATION COMPLETE; TOURED 12/19/2014 BY D. PELLEGRINO;[]2,584 SF GARAGE BLDG RENOVATED INTO OFC SPACE, RENT INCLUDED IN OVERALL FOR ELEMENT; LANDLORD PROVIDED GUTTED SHELL & TENANT DID ALL INTERIOR FIT UP PER PETER FLEURY, PROP. MGR . . . .

JX 53 at 1509.[14] The remark continues:

> SECURE FACILITY W/ DATA CENTER, DELI AND SMALL CONVENIENCE STORE; INTERIOR FINISH IS STANDARD GOV'T OFFICE FINISH; . . . EFFECTIVE YEAR FOR THIS ELEMENT IS BEING CHANGED TO 1990 DUE TO ORIG. BUILDINGS OLDER THAN ELEMENT 5.

*Id.*

Element three—the west wing—includes similar remarks:

> 15RV: SEE REMKS ON ELEMENT 1 REGARDING GUT RENOVATIONS; ALL BUILDINGS TREATED SAME AT TIME OF RENOVATION; EFFECTIVE YEAR ON THIS ELEMENT 1990 DUE TO OLDER ORIGINAL BUILDING; INSPECTION BY D. PELLEGRINO 12/19/2014 . . . .

*Id.* at 1510. Element three also includes a remark about economic rent: "ECON RENT TO 36/SF DUE TO ACTUALS AND NOI." *Id.* Mr. Pellegrino testified at trial that, although no review

---

[14] Ms. Brincefield testified that she authored these and the following remarks for the 2015 review year based on her discussion with Mr. Pellegrino and a review of Mr. Pellegrino's notes following his inspection. *See* Brincefield, Tr. at 775:9–25.

year appears at the beginning of the remark, the comment appears to reflect the County's change

in economic rent for the Property's elements in the 2015 review year, a year in which the County's

estimates for economic rent rose to $35 per square foot.  *See* Pellegrino, Tr. at 441:6–11; *see also*

Brincefield, Tr. at 742:6–18.  As Ms. Brincefield further testified, the remark suggests that the

County changed the economic rent estimate to come closer to actual rent ("ACTUALS") and to

reflect net operating income ("NOI").  *See* Brincefield, Tr. at 739:6–22, 742:6–18.

Comments for element five—the northwest (and newest) wing—also describe the County's

change to economic rent: "ECON RENT TO 36/SF DUE TO ACTUALS AND NOI."  JX 53 at

1510.  They further explain the change to the wing's effective age:

> 15RV: INSP. BY D. PELLEGRINO 12/19/24; SEE ELEMENT 1 NOTES;
> BUILDING TREATED SAME WAY; . . . EFF. YEAR CHANGED TO 2000 DUE
> TO ORIGINAL BLDG BEING NEWER 1984 CONSTRUCTION.

*Id.*

In early 2015, the County issued a tax bill based on the above land parcel assessments.  *See*

JX 111.  The County taxed parcel A in the amount of $1,184,283.47 in real estate taxes for the

year, *see id.* at 1025; parcel B in the amount of $724,082.75, *see id.* at 1026; and parcel C in the

amount of $84,927.24, *see id.* at 1027.  Those values sum to a total 2015 real estate tax bill of

$1,993,293.46, almost $940,000 higher than the year before.[15]

The format of the 2015 notice of real estate assessment change differed slightly from the

format used in prior years, but the 2015 notice still included each parcel's previous value (in 2015,

---

[15] The total 2015 tax bill including, for example, transportation and stormwater taxes in
addition to real estate taxes amounted to $2,296,895 or $3.50 of real estate taxes per square foot,
which is remarkably close to the per-square-foot tax amount stated in Plaintiff's proposal estimate
and independent appraisal conducted prior to Plaintiff submitting its proposal.  *See* Gmyr, Tr. at
1269:9–24; JX 111 at 1025–27.  Neither party presented evidence as to the distinction between
"real estate" and total taxes in the context of this lawsuit.

the County provided the value for the two previous years) and an updated assessment for 2015. *See* JX 33 at 1004–06.  Helpfully, the County included the reason for assessment change in the two years prior to 2015, allowing a recipient to more easily draw a comparison across the years. For parcels A and B, the reasons listed matched previous years' documents: 2013 and 2014 changes occurred due to "REASSESSMENT." *Id.* at 1004–05.  In 2015, however, Ms. Brincefield provided the following reason for change for those two parcels: "NEW CONSTRUCTION."  *Id.* According to the assessors who testified, a change due to new construction means that the assessment reflected construction—either for an entirely new building or as renovations to an existing building—that had been performed at a property.  *See* Pellegrino, Tr. at 476:1–5; Brincefield, Tr. at 760:22–761:6.

### E.    Tax Adjustments, Payments, and Government Investigation

As described above, the Lease provides a mechanism for the parties to establish the Real Estate Tax Base following commencement of the Lease term.  *See* JX 230 at 1282 (Section 4.2). Amounts levied in subsequent years above that tax base would be reimbursed by GSA; any amounts below that tax base would be credited to GSA.  *See id.* (Section 4.2.C.1).  Crucially, however, assuming the unadjusted real estate taxes for the 12-month period following lease commencement are not based on a full assessment, the Lease provides that the tax base will be based on the first full tax year in which Fairfax County determines real estate taxes for the Property taking into account the value of all improvements to the Property contemplated by the Lease.  *See id.* (Section 4.2.B.7–8).

On August 22, 2013, Plaintiff—through its now-president, Vincent Forte—requested reimbursement from GSA "for the increase in real estate taxes over the base year."  Contracting Officer's Final Decision at 37207, JX 15.  The request covered the first half of the 2013 tax year

and represented that the applicable tax base year was the 12-month period following commencement of the lease on December 5, 2011.  *See id.* at 37209.  On January 28, 2014, GSA issued Supplemental Lease Agreement No. 7A establishing the tax base year as 2012 and the tax base amount as $1,057,010.72, as well as approving a reimbursement of $19,707.63 based on the increase in real estate taxes (above the tax base) in tax year 2013.[16]  *See id.* at 37140–41.

For tax years 2014 through 2018, the parties used the same process to implement tax adjustments for real estate tax increases above the 2012 tax base.  *See id.* at 37145 (Lease Amendment No. 11 memorializing tax adjustment to Plaintiff of $2,805.24 for 2014 tax year), 37147 (Lease Amendment No. 12 memorializing tax adjustment to Plaintiff of $867,039.45 for 2015 tax year), 37149 (Administrative Action No. 2 memorializing tax adjustment to Plaintiff of $1,040,265.64 for 2016 tax year), 37151 (Administrative Action No. 4 memorializing tax adjustment to Plaintiff of $1,019,450.43 for 2017 tax year), 37153 (Administrative Action No. 6 memorializing tax adjustment to Plaintiff of $1,032,805.79 for 2018 tax year).  Not surprisingly, when the Property's tax assessment value significantly increased in tax year 2015, the corresponding tax adjustment payments to Plaintiff significantly increased too.  Indeed, the individual adjustment payments for tax years 2015 through 2018 were equivalent to between 82% and 98.4% of the total 2012 tax base.[17]

---

[16] The total reimbursement amount was corrected to $33,613.67, but the tax base year and amount remained the same.  *See* JX 15 at 37126 (noting that payment made under Supplemental Agreement No. 8 was to "correct an error with calculating tax reimbursement" under Supplemental Lease Agreement No. 7A); *see also id.* at 37143.

[17] For reference, Fairfax County billed Plaintiff for the following real estate tax amounts: $2,105,123.45 for 2016, $2,074,864.64 for 2017, and $2,091,244.54 for 2018.  *See* 2016 Real Estate Tax Bill at 1031–33, JX 112; 2017 Real Estate Tax Bill at 1037–39, JX 113; 2018 Real Estate Tax Bill at 1073–75, JX 114.

36

During this period, the parties had some notable interactions related to the steep jump in real estate tax assessments and tax adjustment payments to Plaintiff.  First, in 2015, the County's substantially increased tax assessment caused certain individuals associated with the Property to seek additional information about the Property's tax burden.  Specifically, the Altus Group, a GSA contractor, contacted Vincent Forte to solicit Mr. Forte's views on the County's recent tax assessment and to gauge Plaintiff's interest in pursuing a tax appeal.[18]  *See* Email re: Follow Up on Defense Health HQ at 73312, DX 201; *see also* V. Forte, Tr. at 85:11–86:4.  The contractor ultimately recommended that GSA not pursue an appeal, later indicating to Plaintiff that the contractor's analysts felt there was "too much exposure based on the actual rent received compared to the rent assumption applied in the county's Direct Capitalization approach."  JX 15 at 37201.

Second, Plaintiff's lender, who provided financing for part of the Property's renovation, asked Vincent Forte why the Property's assessment increased so much in the 2015 review year. *See* V. Forte, Tr. at 86:9–87:9.  They wanted to clarify whether the tax amounts that Mr. Forte provided for 2015 represented the full year's taxes or whether the increased amounts captured a half year of taxes in the 2015 tax year.  *See* Email re: Defense Health at 9631, JX 206.  Mr. Forte responded, "We had an increased assessment this year of approx $900K (FFX Co finally caught up).  Base year is 2012 so increase is passed through."  *Id.*  Mr. Forte's statement that Fairfax County "finally caught up" in its assessment suggests that he knew that the prior years'

---

[18] Altus made a recommendation to both Mr. Forte and to GSA, *see* JX 15 at 37201, who, per the Lease, could initiate a tax appeal on its own behalf or jointly on its and the lessor's behalf, *see* JX 230 at 1283 (Section 4.2.D) (outlining procedures for "Tax Appeals").  The Lease provides that any savings to the Government resulting from a tax appeal "shall be decreased by Lessor's reasonable expenses in pursuing the appeal," *id.*, meaning that a successful Government-initiated appeal would result in the lessor's legal costs being covered in whole or in part by the Government. Nothing in the Lease forecloses the Property's owner from initiating its own tax appeal at its own expense.  *See id.*

assessments of the Property failed to capture the value of all renovations to the Property, and that Plaintiff could recoup any difference in taxes because the lower 2012 base-year amount would mean any increase could be "passed through." *Id.* Mr. Forte's attempt to explain away the implication of this statement was, in the Court's view, evasive and unconvincing. *See* V. Forte, Tr. at 87:7–9 (characterizing the statement as a "throw-away sentence that I threw in there for whatever reason just so really for my lender, you know, so I didn't look stupid I guess").

Finally, Kevin Morrison, a lease contracting officer for GSA, who assumed management of the Lease from the previous contracting officer in early 2019, took notice of Plaintiff's sizeable tax adjustment request for the 2018 tax year. *See* Morrison, Tr. at 1036:21–22, 1044:19–1045:14, 1086:13–1087:23; *see also* Email re: Lease LVA02213 at 156579, JX 210. When Plaintiff's January 2019 request for a $1 million tax adjustment for 2018 taxes appeared in GSA's database, GSA employees associated with the Lease received an automated alert indicating that the reimbursement required approval from the lease contracting officer. *See* JX 210 at 156579; Morrison, Tr. at 1086:13–1087:20. Mr. Morrison questioned the "extreme" size of the request. *See* Morrison, Tr. at 1088:24–1089:12 (calling it a "red flag" and "unusual"). He was also struck by the "massive delta between [the] 2014 and 2015" tax adjustment payments for the Property. *See id.* at 1090:15–1091:11 (noting that a normal fluctuation in an annual tax adjustment is typically 3–5% up or down); JX 210 at 156579 (asking another GSA employee, "[T]he tax assessment has gone up 100% in 5 years? Do you know if GSA initiated an appeal on this lease before?"). Mr. Morrison approved the 2018 tax adjustment payment on February 1, 2019, *see* JX 15 at 37152–53, but began to seek additional information about the Property's assessment history, *see* Morrison, Tr. at 1091:5–11. Based on that preliminary investigation, Mr. Morrison worked

38

with a supervisor to set up a call with Vincent Forte in early April 2019 to discuss the Property's tax history.  *See* Morrison, Tr. at 1092:23–1093:18; Email re: DHHQ at 36465, JX 214.

Following that call, Mr. Morrison sought and received additional materials from GSA's tax appeal contractor, the Altus Group.  *See* Morrison, Tr. at 1095:3–12.  Vincent Forte also provided Mr. Morrison with materials from the contractor, noting that the contractor had "determined that an appeal of the real estate tax increase was unwise due to the fact that the increase was due to the additional GSA requested building improvements."  JX 15 at 37178.  Mr. Morrison asked that Plaintiff obtain the tax assessment worksheets from Fairfax County to help explain why the assessment increased so much.  *Id.*  Mr. Forte provided those worksheets to Mr. Morrison in mid-July 2019.  *See* Email re: DHHQ at 161357, JX 215.

After review, Mr. Morrison reached back out to Vincent Forte in early September 2019 to explain his belief that the tax base for the Lease was incorrectly established "as the time period 12/5/2011-12/4/2012."  JX 15 at 37199.  Mr. Morrison explained that he believed the property "was not fully assessed until Tax Year 2015."  *Id.*  As support, he cited the 2015 tax bill's reason for change being "New Construction"; the fact that the Government did not fully accept phase II of the renovation until March 2012, well after Mr. Forte's lease commencement date of December 5, 2011; Fairfax County's reduction in effective age for the Property in tax year 2015; and the tax year 2015 increase in economic rent used to calculate gross potential income for the property.  *See id.*  The premature establishment of the base tax year, Mr. Morrison noted, meant that the Government had been "substantially overpaying" taxes for several years.  *Id.*  He expressed his hope that the parties could "come to a bilateral agreement to speedily resolve this issue."  *Id.*  The next communication Mr. Morrison received was an October 11, 2019, letter from Plaintiff's counsel, challenging Mr. Morrison's proposed base-year reestablishment because, counsel argued,

39

GSA had previously acquiesced to the use of the 2012 tax calculation as the base year. *Id.* at 37203–04.

On October 31, 2019, Mr. Morrison initiated a claim for the overpayment of real estate taxes, issuing a Contracting Officer's Final Decision finding that the tax base should be the real estate taxes for the Property for tax year 2015. *See id.* at 37123. Because the tax base was prematurely set, Mr. Morrison concluded that the Government had overpaid real estate tax adjustments in the amount of $3,413,275.92.[19] *Id.* Mr. Morrison executed Administrative Action No. 8 to reestablish the tax base at $1,993,293.46, the amount that Fairfax County billed to the Property for real estate taxes in 2015. *See* Morrison, Tr. at 1126:19–1127:1; *see also* GREX Lease Documentation at 508, JX 231; JX 111 at 1025–27. He further issued Administrative Action No. 9 memorializing GSA's claim for $3.4 million and its intent to withhold rent in the amount of $142,219.63 per month for a period of 24 months to recoup its overpayment. *See* Morrison, Tr. at 1127:2–20; *see also* JX 231 at 510. On January 14, 2020, Mr. Morrison executed a document laying out calculations for the tax adjustment amount GSA owed Plaintiff for the 2019 tax year. *Id.* at 515. Two weeks later, Plaintiff filed this lawsuit. *See* Pl.'s Compl., ECF No. 1.

## DISCUSSION

The preponderance of evidence shows that, for purposes of determining real estate tax liability, Fairfax County did not assess the value of the Property taking into account all the

---

[19] Mr. Morrison's claim was supported by the breakdown of yearly payments in his Final Decision. As Mr. Morrison noted at trial, it appears his claim of $3.4 million may understate the Government's actual overpayment. *See* Morrison, Tr. at 1125:23–1126:5 ("[I]t totals to $3.4 million, which I later realized was not correct, because I had . . . done this table in Excel, and then when I brought it into the Word document, I brought in the wrong column . . . [and] the actual amount would have been $3.7 million."). Nevertheless, GSA limited recoupment to $3.4 million, consistent with the Final Decision. *See id.* at 1127:21–1128:1.

improvements contemplated by the Lease until the County's 2015 property assessment. The first real estate tax bill for the Property based on full assessment, as that term is defined by the Lease, issued in early 2015. Thus, per the Lease, GSA properly reestablished the real estate tax base at the amount billed in 2015. Because Plaintiff failed to show that GSA breached the Lease, it is not entitled to recovery.

The Court declines Plaintiff's invitation—asserted for the first time in its post-trial brief—to find that the County utilized an incorrect assessment method in its 2015 assessment. Plaintiff provides no support for its assertion that the Court has the authority to adjudicate a substantive challenge to the County's valuation approach. Rather, this Court's only role at trial was to determine whether, as a factual matter, the County took into account the value of all renovations to the Property in its 2013, 2014, or 2015 assessment. Answering that factual question resolves the litigation. Even if considered, Plaintiff's alternative claim for relief based on a windfall theory of damages lacks both a legal and factual basis.

## I.    Legal Standards for Decision

As the parties agree, Plaintiff has the burden to show by a preponderance of the evidence that GSA breached the Lease. *See* Gov't's Mem. of Contentions of Fact & Law at 34, ECF No. 81; Pl.'s Mem. of Contentions of Fact & Law at 31–32, ECF No. 78; *see also BMY Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 116 (1997) ("In civil actions, the presumed burden of proof is a preponderance of the evidence." (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). "To recover for breach of contract, a plaintiff must allege and establish by preponderant evidence: (1) a valid contract between the parties, (2) an obligation or duty arising out of that contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

## II.    Date of Full Assessment

The strongest evidence of full assessment in the Government's favor comes from contemporaneous Fairfax County records.  Specifically, the notes and remarks that the County made for the Property across the relevant assessment years and the reasons that the County offered for changes to the Property's tax assessment weigh heavily in the Government's favor.  Similarly supportive is the County's treatment of the Property's effective age and economic rent over the relevant assessment years.  Although some measure of discretion accompanies an assessor's determination of economic rent, the simultaneous, sharp changes to effective age and economic rent in the 2015 review year strongly support the conclusion that the County did not assess the value of the Property's completed renovation until 2015.  Further, although trial testimony from Fairfax County witnesses presented some factual discrepancies that the Court must resolve—for example, testimony conflicted as to the question of which assessor was responsible for the Property's 2015 assessment—that trial testimony still tends to lend further weight to the Government's case.

When considering both the documents and testimony, a clear explanation for the pattern of the County's tax assessments between 2012 and 2015 emerges.  That is, more likely than not, because of the change in assigned assessor from Mr. Pellegrino to Mr. Aikin the County simply failed to recognize in its assessments that the Property's renovation was complete until Ms. Brincefield took over the assessment during the 2015 review year.  Indeed, Mr. Aikin consistently and explicitly left open the possibility that his assessments of the Property for the 2013 and 2014 review years failed to account for the completion of renovations.

This explanation is more probable than Plaintiff's alternative theory of the case—*i.e.*, that the Property's increase in value between 2010 and 2013 suggests that the County fully accounted

for the Property's renovations by the 2013 tax year (or the 2014 tax year at the latest), and that the driving factor of the 2015 increase—the economic rent—was solely a function of the assessor's subjective weighing of the Property's actual rent. That theory relies on the County having silently determined that the Property's renovation was complete by the 2013 review year—without recording that fact—and then increasing by double the Property's valuation in 2015 without any regard to the value of the completed renovations and the increased income that the Property could generate as a direct result of those renovations.

> **A.**   **Contemporaneous References (or the Lack Thereof) to Construction in the County Records Strongly Suggest that the County Did Not Account for All Renovations Until the 2015 Tax Year.**

The County's documentary records almost conclusively resolve the factual question at issue. Multiple different documents explicitly indicate that County assessors first recorded the completion of the Property's renovations in the 2015 review year. Contrariwise, no evidence in the County's records indicates that the County's tax assessments at any point earlier took into account the completion of renovations.

Of course, an absence of evidence does not logically foreclose that an event may have occurred. But here, where the Court as factfinder is tasked with weighing competing evidence in one party's favor against an absence of evidence in the other party's favor, "something . . . outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989). The Government provided significant record evidence that the County, in conducting its yearly tax assessments, documented in-progress renovations during the 2011 and 2012 review years, failed to record in the 2013 and 2014 review years that the renovations had been completed, and then documented the completion of renovations in the 2015 review year.

43

The County's assessment guidelines make clear that, as a general matter, County assessors should "always" document certain changes to a property, including changes that justify revising that property's effective age, like "the completion of new construction and/or renovations."  JX 124 at 743.  Witness testimony confirmed that assessors "should" make and record such changes upon learning of the completion of significant renovations to a property and that Fairfax County policy and practice instructed assessors to assess only the value of the renovations that were complete as of January 1—*e.g.*, 50% of value for 50% completed renovations.  Brincefield, Tr. at 772:2–6; *see also* Pellegrino, Tr. at 476:1–5 ("Q. And when the notice states 'new construction,' that indicates the assessment took into account construction that was performed on the property, correct? A. That's correct."), 477:5–16 ("A. So if I arrive at a property and it is 50 percent complete, as of the first of the year, and I assess it as 50 percent complete, you know, I have fully assessed what is actual[ly] there as of the first of the year. . . . Q. . . . [I]t's department policy that if a building isn't 100 percent complete, then you wouldn't assess it as 100 percent for that year, correct? A. Correct.").

Keeping in mind that assessors should generally document significant changes to properties, the Court concludes that the County's records firmly support the Government's position that the value of all renovations to the Property contemplated by the Lease was not captured in the County's assessments until 2015.  The 2012 notice of real estate assessment change indicates that construction on the Property's parcels was "PARTIALLY COMPLETED."  JX 30 at 1865–67. But both the 2013 and 2014 notices of real estate assessment change indicate that the Property's value changed based only on a "REASSESSMENT," JX 31 at 998–1000; *see* JX 32 at 989–91, meaning the value changed based on general market trends of property values, *see* Brincefield, Tr. at 758:4–7.  Only in 2015 did the notice reflect that the value of the two parcels that contain the

Property's buildings changed due to "NEW CONSTRUCTION."  JX 33 at 1004–05.  As Ms. Brincefield confirmed at trial, "NEW CONSTRUCTION" typically denotes "permit work" at a property, like a brand-new building or renovations.  Brincefield, Tr. at 760:22–761:6.

The remarks in the Property's valuation history further confirm that the County did not take into account the completion of all renovations until the 2015 review year.  As described above, the 2011 and 2012 remarks contain significant discussion regarding the status of the contemplated or in-progress renovations at the Property.  *See, e.g.*, JX 50 at 1443 (noting that "parts of bldg still in progress" and that "renovations continue" (capitalization removed)); JX 49 at 1421 (noting "major renovations to building underway" (capitalization removed)).  No remarks about the status of construction appear for the 2013 review year or for the 2014 review year.  *See* JX 51 at 1465–67; JX 52 at 1487–89.  Indeed, there are no remarks *at all* for those review years.  *Id.*  Only during the 2015 review year do the County's remarks first reflect that the assessor was aware of the completion of the renovations at the Property.  *See, e.g.*, JX 53 at 1509 (noting as a result of Mr. Pellegrino's site visit on December 19, 2014, that the "major gut renovation" was "complete").

## B.    That the County's Valuation Metrics Changed in 2015 to Reflect the Completed Renovations Strongly Supports Full Assessment in 2015.

In addition to the records explicitly documenting the completion of renovations in 2015, the County's treatment of certain valuation metrics—effective age and economic rent—underscores the conclusion that the County first assessed liability for real estate taxes based on the value of all renovations to the Property in the 2015 review year.

Most importantly, the County's change to the effective ages of the Property's buildings in 2015—which in turn changed the capitalization rates used to calculate the value of parcels A and B under the income approach—strongly supports the conclusion that the County did not take into

account the value of the completed renovations until 2015. In Fairfax County, a "property's effective age is affected by building system upgrades, large tenant improvements and/or renovations of common areas." JX 124 at 743. As a general matter, Fairfax County assessors consider lowering a building's effective age in comparison to its actual age only when the building undergoes significant renovations. *See* Brincefield, Tr. at 772:7–14; Aikin, Tr. at 628:10–13; *see also* Pellegrino, Tr. at 458:11–13 ("Q. And the effective age would not change from year to year based on market conditions, right? A. Correct."), 489:2–8 ("Q. . . . [W]hen the actual age of the building was similar to the effective age, that indicated that there were not any significant improvements or renovations to it since it was originally built, correct? A. Generally speaking, yes, that's correct."). The logic is strong: renovations—specifically, completed renovations—increase a building's lifespan, making it more like new, thus justifying a decrease in the "age" that the County assigns to the building.

That the County did not change the effective ages of any of the Property's elements in 2013 and 2014 weighs strongly in favor of finding that the County did not account for the completion of the significant renovations to the Property in those years. This is especially true considering that (a) there are no remarks in the records for those two review years referencing the status of construction and (b) the reasons for the assessment changes were based solely on market conditions. *See* JX 51 at 1465–67; JX 31 at 998–1000. Conversely, the decrease of the buildings' effective ages in 2015 strongly suggests that the County first accounted for the completed renovations in 2015, after Mr. Pellegrino personally toured the site to assess the status of construction and during the same review period in which the records explicitly document (for the first time) that the Property's renovations were complete. *See* JX 53 at 1509–11.

46

Indeed, Ms. Brincefield testified that the completion of significant renovations, in her view, would have greatly impacted the condition of the Property and its capacity to generate income. *See* Brincefield, Tr. at 788:9–16 (testifying that she changed the effective age to reflect the completion of gut renovations and that the age "should have been changed previously"), 804:4–15 (testifying that she changed the effective age and economic rent in 2015 "to reflect the completion" of renovations that were "completed in 2012" and that she only "learned of" in 2014); *see also id.* at 784:14–25 (indicating that she saw nothing in the Property's valuation history to reflect "the impact of how much work had been done to this building").

Mr. Aikin, who was responsible for assessing the Property in 2013 and 2014, *see* Aikin, Tr. at 512:1–4, confirmed the same fact. He testified that the notation in the 2015 review year indicating that renovations were complete and the fact that the effective ages were changed in the 2015 review year would mean the effective ages were changed "due to completion of those renovations." *Id.* at 659:4–8. There were no other renovations to the Property in 2013, 2014, or 2015 that could possibly support changing the effective ages of the Property's elements. And the evidence established that only a significant change to the Property—like a gut renovation—could have resulted in the change to each element's effective age. Thus, the Court concludes that the renovations at issue here—which were completed in 2012—resulted in the change to the Property's associated effective ages in 2015, meaning the County did not take into account the value of the completed renovations in assessing the Property (*i.e.*, by changing the effective ages) until the 2015 tax year.

Secondarily, the County's decision to increase the economic rent in 2015 further supports the conclusion. Because the County's estimate of economic rent is more discretionary than determining the completion of construction or changing the effective age of a renovated building,

47

the Court acknowledges that the County's decision to increase its estimate of the Property's economic rent in 2015 is not dispositive of the question at issue. But the County's change to economic rent serves as strong supporting evidence for the conclusion that it did not take into account the value of the completed renovations until 2015. Ms. Brincefield testified at trial that her decision to increase the County's economic rent estimate for the Property, while primarily based on her discovery that the economic rent in 2013 and 2014 significantly understated the actual rent earned in those years, also recognized that the Property's income-generating capacity increased enormously as a result of the renovations. *See* Brincefield, Tr. at 746:12–747:16 ("[W]hen I became aware of what the actual rent was, [I asked] why aren't we reflecting something much closer to the actual rent. . . . [A]nd [I] determined that this property was being undervalued and changed the value and changed the rent."), 778:15–16 ("[T]he rent probably should have been increased back in 2012 or 2013."), 804:10–23.

Plaintiff argues that the County's change to economic rent cannot weigh at all in favor of finding that the Property was fully assessed in 2015. *See* ECF No. 122 at 33–36. It argues that the decision was entirely independent of the County's consideration of the completed renovations. *See id.* at 34 (noting that the "Government's expert admitted that the Property's economic rent increased due to actual rent, which *can move* independently of improvements" (emphasis added)). The Court agrees that the County *can* change economic rent independently of assessing improvements to a property. Ample evidence supports the fact that assessors have discretion to set economic rent based on a variety of factors, including consideration of the Property's actual rent. *See, e.g.*, Pellegrino, Tr. at 346:2–21; Aikin, Tr. at 519:12–520:4, 678:10–23; Brincefield, Tr. at 699:13–700:23.

48

The problem for Plaintiff is that it failed to prove that, more likely than not, the County did not consider the completed renovations in updating the economic rent estimate for the Property in 2015. In other words, Plaintiff failed to show the change to economic rent was mutually exclusive of the County's valuation of the completed renovations. Ms. Brincefield testified that part of her decision to update the Property's valuation metrics, like its effective age and its economic rent, represented her effort to capture the immense changes that had been made to the Property and, in her view, had not been captured in previous assessments. *See* Brincefield, Tr. at 777:6–8 ("I've looked and looked and looked, about how extensive this was. You know, major, major renovation."), 778:4–8 ("It is appropriate that the cost approach should be considered and the changes to the building reflected . . . . Well, it hadn't been changed in 2013, it probably should have been changed in terms of effective age. And the rent probably should have been increased back in 2012 or 2013."). Thus, even if the first-order justification for increasing economic rent was an exercise of Ms. Brincefield's discretion to bring economic rent in line with actual rent, the second-order justification for exercising that discretion was—at least in part—the completion of renovations to the Property. The choice to place more weight on actual rent was not made in a vacuum. Ms. Brincefield's awareness of the completion of the renovations and her choice to increase economic rent were clearly related. The correlation is logical. A commercial building's ability to host a paying tenant and command a higher rent depends on the building's construction status. The completion of a renovation appears logically related to the fact that a building's economic rent should likely increase. *See* Pellegrino, Tr. at 387:14–17 (noting that assessors would compare the subject building to other buildings with similar age, quality, and finish to determine economic rent).

Plaintiff's final argument concerning the County's valuation metrics relates to the County's assessment of the relative quality of each building on the Property. Specifically, Plaintiff argues that the County could not have assessed the completed renovations for the first time in 2015 because between 2014 and 2015 the County's view of the "quality" of element 1—the east wing—dropped from "Good" to "Average." ECF No. 122 at 25; *see also* JX 52 at 1470 (showing "QUAL" as "GD" for the building in 2014); JX 53 at 1492 (showing "QUAL" as "AV" in 2015). To be clear, the County's assessment of the building's quality does not factor into its valuation of the building, at least under the income approach, but Plaintiff argues that it "beggars belief" to suggest that the Property "could increase in value" because of improvements when the County "clearly believed that the quality of the Property had diminished year over year." ECF No. 122 at 35–36. But the Government provides a simple explanation for the change that is supported by witness testimony and that Plaintiff does not rebut: the changes the County made to each building's effective age meant that the group of comparators to determine the east wing's quality also changed. *See* Closing Arg. Tr. at 1520:3–20, ECF No. 127. In essence, when the building was "older," its quality could have been "good" based on comparisons to other buildings of the same age. But by decreasing the effective age, the County compared its quality to other, newer buildings—resulting in an "average" quality assessment when compared to that younger group. *See* Pellegrino, Tr. at 387:12–17 (noting that a building's real-estate class is "subjective" and that assessors would "just look at buildings with similar age, similar quality and finish, that sort of thing").

Regardless, to the extent the evidence favors Plaintiff, the County's view of the quality of the Property's buildings in review year 2015 does not tip the scales. On balance, the County's records—including the valuation history remarks, reasons for change to assessments, and valuation

metrics—constitute preponderant evidence in favor of the Government.  Based on that evidence, as well Ms. Brincefield's testimony that she only became aware of the completed renovations in late 2014 and believed that both valuation metrics should have been increased earlier, the most likely explanation for the County's changes to effective age and economic rent in 2015 is that the assessment for that review year took into account the value of the completed renovations and the impact those renovations would have on the Property's ability to generate income.

### C. Trial Testimony Suggests that the County Did Not Account for the Completed Renovations Until the 2015 Tax Year.

Fact witness testimony about the County's practices, procedures, and assessment of the Property further adds to the weight of evidence supporting full assessment in 2015.  Although Plaintiff established with preponderant evidence that Fairfax County assessors *should* update assessments to incorporate the value of renovations to a property as of January 1 of each year and that it was the assessors' typical practice to do so, Plaintiff failed to prove that in this case the County *actually* incorporated the value of the Property's completed renovations any earlier than the 2015 assessment.  Indeed, trial testimony showed that responsibility for assessing the Property transitioned through a series of three assessors during the review years at issue in this lawsuit and, likely as a result, the County simply did not catch the final completion of renovations until late 2014, just in time for the 2015 assessment.

*David Pellegrino's testimony*.  The Court gives Mr. Pellegrino's testimony strong weight. The Court found him to be a credible witness who provided direct answers on subjects about which he had personal knowledge, declined to speculate on subjects outside his knowledge, and generally presented with a demeanor indicating confidence in his answers and truthfulness in his responses. Mr. Pellegrino's testimony tends to support several clear factual conclusions: (1) Mr. Pellegrino

was responsible for assessing the Property for the 2009 through 2012 review years, *see, e.g.*, Pellegrino, Tr. at 344:19–22; (2) Mr. Pellegrino was aware of and personally observed ongoing renovations to the Property through the end of 2011 and beginning of 2012, *see, e.g.*, *id.* at 404:6–405:8; (3) for the 2012 review year Mr. Pellegrino assessed the value of the partially completed renovations at the Property as of their completion status in January 2012, *see, e.g.*, *id.* at 410:3–413:4; (4) Mr. Pellegrino then moved to North Carolina for two years, during which he had no involvement in assessments in Fairfax County, *see id.* at 371:7–13; (5) Mr. Pellegrino then returned to the County in 2014, *see id.*; (6) Mr. Pellegrino was asked to conduct a site visit at the Property in late 2014, *see id.* at 431:25–433:1; (7) he reported his observations from that site visit to the individual who asked him to inspect the Property, *see id.*; and (8) Mr. Pellegrino had no involvement in the 2015 assessment other than reporting the information he derived from his 2014 site visit, *see id.*

Mr. Pellegrino's testimony also helped established the general practices and procedures of Fairfax County assessors, including the general considerations assessors weigh in estimating economic rent, *see, e.g.*, *id.* at 386:22–387:17; photos assessors take during site visits, *see, e.g.*, *id.* at 400:22–401:4; typical site-inspection frequencies, *see id.* at 402:9–22; and the County's practice of doing its "best" to ensure that assessors promptly incorporate significant physical changes to buildings into their yearly assessments, *id.* at 372:3–23.[20]

---

[20] In general, the Fairfax County witnesses all gave testimony that supported a consistent understanding of the County's practices and procedures, although Mr. Aikin, as the Court notes below, cabined his testimony multiple times with caveats suggesting that changes to assessments may not always happen so promptly.

*Jonathan Aikin's testimony*.  Unlike Mr. Pellegrino, Mr. Aikin's testimony was marked by hesitancy, qualifications, and a lack of independent memory.  As a result, the Court has reason to doubt that Mr. Aikin reliably recalled and described his assessments of the Property.[21]  This is especially true of the 2015 assessment, for which Mr. Aikin claimed responsibility.  *See* Aikin, Tr. at 512:1–12, 547:6–9.  As discussed above, Ms. Brincefield more credibly testified that she—not Mr. Aikin—prepared the assessment of the Property in that year while Mr. Aikin was on leave.  *See* Brincefield, Tr. at 730:23–731:1, 745:19–746:19.  All of Mr. Aikin's testimony about the 2015 assessment is therefore based on a false assumption that he was involved.

Given the lack of a specific recollection and the numerous times Mr. Aikin qualified his remarks about his general practices, the Court has even greater reason to doubt that Mr. Aikin necessarily followed his general practice of promptly assessing completed renovations and updating associated valuation metrics when he assessed the Property in 2013 and 2014.  Specifically concerning is the fact that Mr. Aikin consistently left open the possibility that certain changes to the Property may not have been immediately considered in his assessments.  *See, e.g.*, Aikin, Tr. at 530:12–24 ("A. Typically we try to value property as it is as o[n] the assessment date.  There's times, though, that the information is not added to the property record until after the assessment date . . . . Q. And [by] after you mean the following year?  A. It could be -- yes. It could be the following year or, you know, as soon as you can update the property record.  Q. Okay, but it typically wouldn't be two years later, right?  A. Hopefully not."), 535:9–18 ("Q. When you

---

[21] Indeed, Mr. Aikin repeated numerous times that he had no specific recollection of any of his assessments of the Property.  *See, e.g.*, Aikin, Tr. at 517:16–18 ("I don't really remember the specifics of the property from, you know, that long ago."), 683:13–20 ("I mean, I don't specifically remember, you know, going through the motions of doing the assessment, of entering the information.  Yeah, I don't have anything that kind of jumps out, yeah, atypical or anything.").

assessed the property in 2013 and 2014, did you do your best to ensure that you implemented your personal practice of fully assessing whatever improvements were completed as of January of those two years?  A. Well, I would think I would try to do my best . . . . Of course, sometimes renovations are missed or not added to the record timely."), 679:22–680:2 ("Q. And so based on this comment, is it your belief that the reason that the economic rent was changed in 2015 was that Fairfax County simply placed more weight on actual rent than they had in prior years?  A. Yes, and it may have been, you know, missed previously without updating it.").

Even considering Mr. Aikin's testimony about the 2013 and 2014 assessments alone, without weighing it against the significant evidence in the other direction, the testimony is at best equivocal, and even slightly favors the Government.  The most reliable conclusions the Court can make about Mr. Aikin's testimony are that: (1) Mr. Aikin had no specific recollection of making his yearly assessments in 2013 and 2014, *see, e.g.*, *id.* at 683:13–20; (2) Mr. Aikin generally did his best to ensure construction was promptly picked up in his assessments, *see id.* at 535:9–18; (3) Mr. Aikin demonstrated a keen awareness that construction was not always picked up as promptly as possible, *id.* at 535:17–18; (4) Mr. Aikin never documented anything about the renovation of the Property—indeed, no remarks appear in the valuation history reports in those years, suggesting that he did not follow his practice of assessing construction as soon as possible in this case, *see id.* at 653:18–655:2 (confirming that remarks about construction appear only for the 2011, 2012, and 2015 review years and that he did not know who authored the 2015 remark), 664:13–665:2 (indicating that he would have expected the completion of renovations to be reflected in the remarks and the assessment); and (5) Mr. Aikin  listed "REASSESSMENT" as the reason for the changes to the Property's value in 2013 and 2014, *see id.* at 617:1–16, 631:13–18, 632:3–22, suggesting that he merely conducted a check of the Property's valuation against market trends

instead of visiting the Property and confirming that the renovations were complete, *see* Pellegrino, Tr. at 472:24–473:12; Brincefield, Tr. at 758:4–7.

   *Catherine Brincefield's testimony.*   Ms. Brincefield's testimony was by far the least supportive of Plaintiff's theory of the case.  Ms. Brincefield appeared nervous at times and evinced a desire to avoid stating or misstating anything that she believed might get her former coworkers or the County in "trouble."  *E.g.*, Brincefield, Tr. at 778:13–20.  Although at first Ms. Brincefield had limited memory of her involvement in the 2015 assessment, her recollection became more specific while reviewing the County's documents during her testimony.[22]  *See id.* at 778:8–12.  But the Court credits Ms. Brincefield's testimony because of her clear desire to be as truthful as possible and the fact that she appeared to accept the "blame," *id.* at 776:14, for the 2015 assessment resulting in such a significant and long-running dispute, *see id.* at 745:8–747:17, 762:1–763:9, 775:10–780:5.

   Ms. Brincefield's testimony reasonably supports one conclusion: the County did not account for the value of the completed renovations to the Property—specifically, by updating the effective ages for the Property's elements and, secondarily, updating economic rent to align more closely with actual rent (which was itself justified both by the rent paid under the Lease and the significant renovations contemplated by that lease)—until its 2015 review year.[23]  *See id.* at 777:3–

---

   [22] As the parties recognized, Ms. Brincefield's trial testimony contained significantly more detail than her deposition testimony, including her belief that she was more directly involved in the 2015 assessment of the Property than she previously remembered.  *See* Brincefield, Tr. at 769:13–19.

   [23] To be clear, the Court does not consider this testimony to be the sole dispositive piece of evidence in the Government's favor.  Nearly all the rest of the evidence submitted also favors the Government.  Ms. Brincefield's testimony is, though, perhaps the strongest evidence, along with the County's written records.

16, 778:13–20.  Indeed, it appears that Ms. Brincefield may have been the one County employee to catch the error.  When she took over Mr. Aikin's appraisals while he was unavailable, she realized that one permit had not yet been marked complete and asked Mr. Pellegrino to conduct a site visit to pick up the outstanding permit, at which point he reported to her the extent of work that had been completed.  *Id.* at 776:1–23.  Only then did she become "really aware" of "all the permit work" on the Property and that the County's valuation had failed to account for the completion of the renovations.  *Id.* at 776:14–777:16.

In sum, trial testimony from the Fairfax County assessors weighs in favor of the Government's theory of the case.  More likely than not, while the County considered the value of partially completed renovations in the Property's 2012 assessment, the County failed to confirm the completion of and take into account the value of the Property's renovation in either the 2013 or 2014 assessments, likely due to the transition in assessors from Mr. Pellegrino to Mr. Aikin. After primary responsibility for the Property's assessment shifted from Mr. Aikin to Ms. Brincefield, and after Mr. Pellegrino inspected the Property in late 2014, the County finally became aware of the completion of renovations and updated its 2015 assessment to reflect the Property's value as a fully renovated commercial office building.

### D.    The Pattern of the Property's Valuation Suggests Full Assessment Occurred in the 2015 Tax Year.

Each party presented expert evidence intended to illustrate how yearly changes to the Property's assessments supported each theory of the case.  Plaintiff introduced expert testimony that the increase to the Property's valuation between 2010 and 2012 necessarily reflected

assessment of the renovations to the Property that were partially completed during that time.[24]  *See* Lipman, Tr. at 901:2–902:20.  Full assessment, according to the expert, occurred in the tax year following the completion of construction—*i.e.*, 2013.  *See id.* at 921:9–11.  As he noted, in the 2013 review year, the County had available to it the data necessary to assess the value of all renovations contemplated by the Lease.  *Id.* at 909:6–10 (noting that all the certificates of occupancy and all but one work permit had been completed).

The Government introduced rebuttal expert testimony intended to illustrate that Plaintiff's expert had overstated the extent of the Property's increase in value attributable to renovations by choosing a comparison year—2010—that reflected depressed property values as a result of the 2008–2009 financial crisis.  *See* Lennhoff, Tr. at 1400:2–1402:12 (opining that in 2010 the Fairfax County real estate market was still recovering from the Great Recession).  In the expert's opinion, the conclusion that full assessment occurred in 2015—when the County significantly increased the value of the Property by decreasing the buildings' effective ages (and by extension the capitalization rates) and increasing the economic rent—"sort of jumps off the page at you."  *Id.* at 1393:15–16 (also noting that the County first documented the completion of construction in the 2015 review year after Mr. Pellegrino's site visit and documented "new construction" as the reason for the assessment change).

---

[24] Prior to trial, Plaintiff claimed that the 2012 tax assessment reflected the value of all renovations contemplated by the Lease.  It has since abandoned that theory, in large part because the mid-2012 completion of the Property's interiors could not possibly have been factored into the County's 2012 assessment, which was finalized in January 2012.  *See* ECF No. 122 at 6 n.1; Trial Tr. at 1026:23–25.  As Mr. Pellegrino testified at trial, he inspected the Property several times in early 2012 and the County's assessment policy required assessors to assess property value "as of" January 1 of each year.  Pellegrino, Tr. at 524:25–525:7.  His remarks in the County's records confirm that, for the 2012 assessment, he did just that, noting that "renovations continue as of 1/1/12."  JX 50 at 1443.

Apart from interpreting the County's records (which mostly speak for themselves), each party's expert provided only minimally weighty evidence in support of the parties' respective theories. For instance, the Court credits Plaintiff's expert's opinion that the County accounted for the value of partially completed renovations in its 2012 assessment of the Property; indeed, Mr. Pellegrino testified that he did so, and the 2012 notice of real estate assessment change specifically identifies partial construction. While legally immaterial, the Court likewise credits the expert's opinion that the County had access to all the information it needed to fully assess the Property in the 2013 review year. Plaintiff's expert failed, though, to provide evidence that the County *actually* accounted for the value of all renovations in the 2013 or 2014 tax assessments.

Plaintiff's expert's theory boils down to an argument that the changes to the Property's valuation between 2010 and 2013 reflect that the County captured the value of the partially completed renovations in the 2012 assessment—as Mr. Pellegrino testified—and that the slight increase in 2013 reflects the County's final assessment of the remaining renovations. *See* Lipman, Tr. at 909:1–10 (describing the Property's 1.1% increase in value in 2013 as "essentially capturing the balance of all the work that had been done" since January 1, 2012). But that theory is not supported by the County's records themselves, which do not reference the Property's renovations at all in relation to the 2013 review year and affirmatively identify the reason for the increase in assessed value as "REASSESSMENT." JX 31 at 998; *see* JX 51. Indeed, the modest 1.1% increase in value from 2012 to 2013 is a minor fluctuation that would be completely consistent with a small change based on market trends. For example, the Property's value fluctuated by a similarly modest degree in the 2014 assessment, decreasing 3.6% due to market changes. *See* JX 32 at 989 (identifying "REASSESSMENT" as reason for change). In short, the expert's theory that the County accounted for the completed renovations—silently, without documenting the

fact—in its small increase in value in the 2013 review year does not tip the scale in Plaintiff's favor.

On the other side, the Court credits the Government's expert's opinion that much of the Property's increase in assessment value between 2010 and 2012 can be explained by a general recovery in property values as the region emerged from the Great Recession, especially considering the Property's relatively higher values in 2007, 2008, and 2009. Indeed, in 2012, the County assessed the Property as being only about $5 million higher in value than the assessment for 2008, which was the last assessment of the Property before the financial crisis when the buildings were in their pre-renovated condition. *See* Lennhoff, Tr. at 1390:1–10 ("[T]hat told me nothing has really been picked up here."). However, even the expert, albeit hesitantly, acknowledged that at least some of the increase reflected in the 2012 assessment was based on the value of partial construction as shown by the witness testimony and County records. *See id.* at 1432:24–1433:1.

Regardless, the Court agrees with the Government's expert's overall interpretation of the valuation history and ultimate conclusion regarding the 2015 tax assessment—the significance of the County's notations tends to "jump off the page at you." *Id.* at 1393:15–16. What is clear, as explained above, is that the County's records reflect that it first considered the completion of all renovations to the Property in the 2015 review year; that the County changed certain valuation metrics in 2015—most importantly, the buildings' effective ages—to reflect those completed renovations; and that, as the fact witnesses testified, personnel transitions in the County's assessment office likely led to a delay in capturing the full value of the completed renovations until the end of 2014, just in time for the 2015 assessment cycle.

### III.    Equitable "Windfall" Theory of Damages

In its Post-Trial Brief, Plaintiff asserts for the first time an alternative theory of windfall damages.  It argues that, even if the County did not fully assess the Property until 2015, the Court should order damages anyway on the basis that the County incorrectly used the income assessment method to value the Property in 2015 when it should have used the cost method instead.  *See* ECF No. 122 at 40–45.  Plaintiff provides no legal authority for the proposition that the Court has jurisdiction to determine whether the County erred in using a particular assessment method.  *See id.*  Nor could it.  Under the Tucker Act, this Court's jurisdiction is limited to Plaintiff's claim against the United States arising under the Lease, and the Lease provision at issue in this case does not require the Court to consider whether the County's full assessment of the Property was properly calculated.  It simply requires the Court to determine when full assessment occurred.  Any challenge Plaintiff has to the correctness of Fairfax County's assessment is a matter that it must raise through the County's real estate assessment appeals process.

Regardless, even if the Court had jurisdiction to consider Plaintiff's argument, the question of whether a party may benefit from an unfair windfall is typically reserved for instances where one party is found to have breached the contract and a court is faced with determining what remedy the non-breaching party should receive.  *See, e.g.*, *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004).  The Court is unaware of any authority permitting it (or any other court) to order damages under a windfall theory even where the defendant has *not* breached the contract.  That principle alone is enough to reject Plaintiff's theory.

Additionally, it is not at all clear that the evidence Plaintiff relies on to support its argument stands for the proposition that the cost approach was the appropriate method to use.  The only fact evidence Plaintiff cites is testimony from Mr. Aikin that the "cost approach is more reliable with

completely new construction," Aikin, Tr. at 616:2–8, and a County guideline stating that "[i]f an office building is under construction as of January 1st of the year, the building will most likely be valued using the cost approach," JX 124 at 739.[25] But Mr. Aikin also testified that the most weight is given to the income approach when a property generates income and the County has access to data relating to that income. *See* Aikin, Tr. at 615:16–616:1. By 2015, the Property had been generating income (as rent) under the Lease, and the County had access to that actual rent data since, at the latest, the beginning of the 2013 review year.

Further, the County's guidelines explicitly note, two sentences after the guideline that Plaintiff quotes, that "[i]f the shell [of the newly constructed office building] has been completed, the income approach should be used." JX 124 at 739. Here, the warm-lit shell was complete by December 5, 2011, *see* JX 163 at 33385; JX 164 at 274148, suggesting that the County's own guidelines would have recommended using the income approach to value the Property in 2012.

In sum, the Court rejects Plaintiff's request for damages based on a theory that Fairfax County incorrectly valued the Property in 2015 for purposes of full assessment. No legal authority supports the request, and Plaintiff failed to show that the County acted improperly in performing its assessment.

---

[25] Mr. Lipman testified that he understood the County's uniformity guidelines to "instruct assessors to use the cost approach in the first year of the assessment" of a new building. Lipman, Tr. at 925:5–10. As discussed here, Mr. Lipman's interpretation appears to be incorrect. The guidelines plainly state that if the exterior of a newly constructed building is complete, the income approach should be used. JX 124 at 739; *see also* Lipman, Tr. at 1005:10–25.

**CONCLUSION**

Based on the foregoing, the Court finds that Plaintiff failed to meet its burden to show that GSA breached the Lease or that Plaintiff is entitled to any damages.  The Clerk is **DIRECTED** to enter final judgment in favor of the United States pursuant to RCFC 58.

**SO ORDERED.**


Dated: September 19, 2025                    /s/ Kathryn C. Davis

                                             KATHRYN C. DAVIS
                                             Judge